# MORRIS GOLDEN AND ANOTHER v. CITY OF ST. LOUIS PARK.

122 N. W. (2d) 570.

June 28, 1963—No. 39,059.

*H. Horace Burry,* City Attorney, and *Herbert C. Davis,* for appellant.

*William S. Rosen* and *Dworsky & Rosen,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Plaintiffs as owners of certain real estate within defendant city's corporate limits brought this action for a declaratory judgment determining that defendant's action in denying plaintiffs' application for a permit to construct and operate an *automobile reduction yard* upon such real estate was discriminatory and invalid; determining that certain provisions of the zoning ordinance of defendant city under which it purported to act were unconstitutional and void; and directing defendant to adopt an appropriate resolution approving such application.

The court determined that the use of plaintiffs' property as an *automobile reduction yard* in the manner described in their application would not constitute a nuisance and that defendant's action in denying such application was arbitrary, unreasonable, void, and in contravention of plaintiffs' rights. It directed that defendant and its agents forthwith issue to plaintiffs the special permit described and reserved jurisdiction to implement the rights of the parties pursuant to its decision if necessary.

This is an appeal by defendant from an order of the court denying its subsequent motion for amended findings or a new trial. Defendant contends here that (1) its actions in denying plaintiffs' application for the special permit described were within its legislative authority and hence subject only to limited judicial review; (2) the court's findings are not supported by the evidence; (3) the court erred in its reception of evidence relating to the manner in which plaintiffs intended to operate their property as an *automobile reduction yard* and in receiving photographs and descriptions of business enterprises pres-

ently operating adjacent to plaintiffs' property; and (4) the court erred in rejecting testimony relating to the mental considerations of members of its council in acting upon plaintiffs' application.

The provisions of the St. Louis Park zoning ordinance involved in these proceedings are as follows:

"Section 6:032.7. Auto Reduction Yard: A lot or yard where three (3) or more unlicensed motor vehicles or the remains thereof are kept for the purpose of dismantling, sale of parts, sale as scrap, storage, or abandonment."

"Section 6:142—Uses by Special Permit—Within any 'I-1' Industrial district, no structure or land shall be used for the following uses except by special permit."

"Section 6:142.6. Conducting any of the following operations and the sale at wholesale, manufacture, fabrication or processing of any of the following articles or products; provided no special permit shall be granted for such uses within four hundred (400) feet of any 'R' Use District:

\* \* \* \* \*

"Subd. 4. Automobile reduction yard."

"Section 6:191—General—The City Council may by resolution grant Special Permits for uses and purposes elsewhere in this ordinance provided, and may impose conditions and safeguards in such Permits to protect the Comprehensive Plan in harmony with the general purpose and intent of this ordinance and the Comprehensive Plan. Applications for Special Permits shall be filed in the office of the Zoning Administrator.

"Section 6:192—Referral to Planning Commission—Before authorization of any Special Permits, the request therefor shall be referred to the Planning Commission for study concerning the effect of the proposed use on the Comprehensive Plan and on the character and development of the neighborhood, and for its recommendation to the City Council for the granting of such Special Permit and the conditions thereof, if, any, or for the denial of such Special Permit.

"Section 6:193—Issuance—In considering applications for Special

Permits under this ordinance, the City Council shall consider the advices and recommendations of the Planning Commission and the effect of the proposed use upon the health, safety, and welfare of occupants of surrounding lands, existing and anticipated traffic conditions, including parking facilities on adjacent streets, and the effect on values of property in the surrounding area, and the effect of the proposed use on the Comprehensive Plan. If it shall determine by resolution that the proposed use will not be detrimental to the health, safety or general welfare of the community nor will cause serious traffic congestion nor hazards, nor will seriously depreciate surrounding property values, and that the same is in harmony with the general purpose and intent of this ordinance and the Comprehensive Plan, the Council may grant such permits and may impose conditions and safeguards therein.

"Section 6:194—Denial—Special Permits may be denied by motion of the City Council and such motion shall constitute a finding and determination by the City Council that the conditions required for approval do not exist."

The findings upon which the court ordered judgment for plaintiffs were in part as follows:

"The property subject to his action * * * is located in the I-1 use classification as described by the Ordinance. The I-1 use classification * * * permits the conduct of an automobile reduction yard only if the Council shall grant a Special Use Permit for its establishment and operation. * * *

\* \* \* \* \*

"On October 29, 1962, plaintiffs presented to the City an application for a Special Use Permit, under the section noted above [§6:190 quoted *supra*], for the operation of an automobile reduction yard. Such application was presented by the plaintiffs through their counsel and architect to the Planning Commission for its consideration on November 7 and December 6, 1962. The Planning Commission is charged with the consideration of applications for Special Use Permits and recommendation of considerations and actions to be taken by the Council. [§§ 6:192, 6:193.] The Planning Commission received reports of the staff planner, a full-time employee of the City, who stated in part:

" 'From a land use planning standpoint, it must be noted that auto reduction yards are a necessary part of the urban scene, just as cemeteries, dumps, junk yards, etc. are. Since the basic requirements that they be located in a heavy industrial district and that they be located 400 feet away from residential properties have been met, it would seem that the actual locational decision must be based on factors in addition to those encompassed by pure planning standards.'

"It also received reports from various other departments of the city government in addition to the materials presented by the plaintiffs and, after the hearings above described, recommended to the Council that the application be denied. On December 17, 1962, plaintiffs made their presentation to the Council of the City and, after such presentation, the Council voted to deny the request. * * *

*    *    *    *    *

"Applicants have made numerous statements and have filed pictures and maps with the Planning Commission and to the City Council stating their intentions as to the operation of their yard; they promise that there will be no burning, crushing, or stacking of dismantled wrecks, that scrap will be removed daily in large buckets; that there will be a solid fence, that they will store their cars on the lot with sufficient area around each wreck to enable the work of dismantling to be carried on without moving one wreck to get at another; that they will not operate at night; that their purchases and dismantling operations will be limited primarily to passenger vehicles; that there will be in the yard storage facilities for body parts on wooden racks and storage for other parts in wooden bins as shown on an architect's drawing instead of on the ground as is customary.

"The Zoning Ordinance provides that no property within an I-1 Industrial District may be used as an automobile reduction yard unless it is at least 400 feet distant from any residential district and unless a special permit granting such use is obtained from the City Council; the plaintiffs' above described property is more than 400 feet from the nearest residential use district.

"That the operation and maintenance of said automobile reduction

yard on said property will not create a traffic hazard and will not interfere with or unduly burden existing traffic.

"That the use of plaintiffs' property as an automobile reduction yard will not cause any hazard to the public health or public safety.

"That the use of the plaintiffs' property as an automobile reduction yard will not adversely affect the market value of adjoining and nearby properties.

"That the plaintiffs' property is surrounded on all sides by industrial businesses, some of which have outside storage, including outside storage of waste, and that the basic character of the surrounding area is industrial in activity and appearance.

"That the use of plaintiffs' property as an automobile reduction yard will be compatible and consistent with the uses now being made of the adjoining and nearby properties, and said use will not affect, impair, or interfere with the use and enjoyment of said adjoining and nearby properties.

"That the use of plaintiffs' property as an automobile reduction yard will not constitute a nuisance.

"That the use of plaintiffs' property for an automobile reduction yard will not materially increase any existing drainage problem in the area in which said property is located, and the drainage from plaintiffs' property will not materially affect, impair or interfere with the use and enjoyment of other property.

"That the use of said property as an automobile reduction yard will not create any fire hazard.

"That the use of plaintiffs' property as an automobile reduction yard will have no adverse effect on public morals or the general welfare of the community.

"That the denial of plaintiffs' application for a special permit by the City Council of the City of St. Louis Park was arbitrary, unreasonable, capricious, and void."

In a memorandum attached to its order, the trial court stated:

"* * * [defendant's position] is that the City Council was justified in rejecting plaintiffs' application because to do so was in the interests of

the health, safety and welfare of the community because the establishment of an auto reduction yard at the location in question would:

"1. Create a health problem because of rodents,

"2. Create parking and traffic problems,

"3. Create police and law enforcement problems,

"4. Adversely affect the value of surrounding property,

"5. Create drainage problems,

"6. Be esthetically undesirable, and

"7. Constitute a nuisance.

\* \* \* \* \*

"No substantial merit is found to the claims of the City with reference to Items 1, 2, 3 and 4 above. The health problem seems entirely without merit. The evidence does not disclose any reason why plaintiffs' proposal would create any more of a traffic and parking problem than would the establishment of any other business on the property. Indeed, there are many types of uses where a permit would not be required that would create much greater parking and traffic problems. The statement just made is equally applicable to the police problem. To the extent that property values may be adversely affected (and the weight of evidence does not establish that they will be), it is only because of the esthetic problem to be considered later.

"As to drainage, the evidence discloses that plaintiffs' land slopes from east to west, as does the area immediately to the east of this land. The slope is relatively gradual. There are two rather small sumps on plaintiffs' land and, because of these sumps and for other reasons, plaintiffs' land has to some extent held a portion of the surface water on the land to the east as well as some of its own. A substantial part of the water has, because of the contour of the land, flowed and seeped into a ditch west of plaintiffs' property. The proposed improvement of plaintiffs' property will to some extent increase the drainage problem. It is conceded by the City, however, that this increased problem would exist if the land is to be improved for most other uses.

"Plaintiffs have urged that the drainage problem is one not directly related to the question before the Court; that it will properly arise only

when application is made for a building permit. Plaintiffs are probably right. But, because of the attention given to the problem during the trial, some comment seems called for. It is not intended that this comment shall constitute a final ruling on any specific problem that may arise in the future. * * *

\* \* \* \* \*

"Plaintiffs' proposal seems to be fully within the limits of their rights under the applicable law.

"If there is to be an auto reduction yard in St. Louis Park, the proposed area is an appropriate one for its location. Auto reduction yards are a common and perhaps necessary part of the modern industrial and commercial scene. We are not concerned in this case with the problem that would be presented if the City had attempted in its Zoning Ordinance to prohibit such an activity within its limits.

\* \* \* \* \*

"Although for obvious reasons the argument has not been advanced directly, I have been unable to escape the conviction that the primary reason for rejection of plaintiffs' application is the esthetic one. I am not entirely lacking in sympathy with defendant's position on this ground. Auto reduction yards are usually unsightly. None seem to add beauty to the municipal scene. Some are indeed eyesores, but many other industrial and commercial enterprises are unsightly, including some in the area adjacent to plaintiffs' property.

"Auto reduction yards, as indicated, are a common and probably almost a necessary part of the industrial and commercial scene. Plaintiffs' proposal indicates that the operation on the land in question will reduce undesirable features to a minimum. The premises need not be as unsightly as many such yards are. It need not be an eyesore—even though the yard in operation will probably not, from the esthetic standpoint, bear a great deal of resemblance to the architect's drawing received in evidence in this case.

\* \* \* \* \*

"Here the surrounding area is primarily industrial. The property is zoned for industrial uses. Some of the present uses do not appeal to aesthetic senses. Industrial uses often do not. Some of the present uses in

the area surrounding plaintiffs' property are claimed by the City to be non-conforming under the Ordinance. This may be true, but it does not alter the fact that if there is to be an auto reduction yard in St. Louis Park, the location in question is an appropriate one.

"Although no Minnesota case is directly in point, it seems to be established law that an auto reduction yard is a lawful business and not a nuisance per se, although they may be operated so as to constitute one. See cases cited and discussed at 84 A. L. R. 2d 653.

\* \* \* \* \*

"\* \* \* An operation such as proposed by plaintiffs would not constitute a nuisance in the area of plaintiffs' land. The parties agree that the Council may impose reasonable conditions to the granting of the permit. It is not this Court's function at this time to determine what these conditions shall be. However, they may prevent the creation of a nuisance and plaintiffs may be held to substantial compliance with the terms of their application. They should be reasonable and not used as a means to circumvent plaintiffs' rights."

It is undisputed that plaintiffs' property is in the heart of an area classified as I-1 (heavy industrial) under defendant's comprehensive zoning plan. Under this zoning plan, no residential districts will be within a mile of plaintiffs' proposed *automobile reduction yard*. It is presently surrounded by varying types of industry including the following:

To the south and west is the plant of National Lead Company which employs 35 people. It conducts a smelting operation for converting scrap lead into new lead, in which operation gaseous fumes are emitted from a large furnace. On its property are maintained a slag bin or dump, a number of warehouses, and a filtering system. Its main plant includes a smokestack some 200 feet in height.

To the south of National Lead Company are the main tracks of the Minneapolis & St. Louis Railroad Company. Its branch lines extend to the south and west and north of plaintiffs' property.

To the west of plaintiffs' property is the plant of Union Carbide Chemicals Corporation and Pyrofax Gas Corporation. They are engaged in manufacturing chemicals and gas products which are stored upon their property. To the west of this plant is the plant of the M. L. Gordon

Sash & Door Company engaged in manufacturing window frames and doors. To the west of the latter is the Androc Chemical Company engaged in manufacturing a chemical used in the preservation of telephone poles. It also manufactures grease and a liquid preservative. Its manufacturing plant includes a number of large vats where oil is mixed with a product know as "penta," which comes packaged in sacks. After such mixture the product is pumped into trailer and railroad tank cars.

Other manufacturing plants near plaintiffs' property include the following: Robinson Rubber Products Company; Lakeland Door Company; Hoglund Plumbing Company, with adjacent storage yard; Black Top Service Company; Cambridge Brick Company; Terry Excavating Company; Republic Creosoting Company; Suburban Ready Mix Company; Freidheim Cement Block Company; St. Louis Park Garage; Phillips Corporation; Belt Line Corporation; Archie Walker Volkswagen Company; Allied Gas Company; Walter D. Giertsen Construction Company; Dayton Rogers Company; and B. M. D. & R. Lighting Company. Many of the plants enumerated are engaged in heavy industrial activity and have constructed substantial buildings therefor as authorized by defendant's zoning ordinance.

Adjacent to the north boundary of plaintiffs' property is State Highway No. 7, a 200-foot highway which separates the heavy industrial area in which plaintiffs' property is located from another industrial section to the north and beyond that from a residential section of defendant city more than a mile away.

Plaintiffs submitted architectural plans and drawings as to the type of installation for which the special permit was requested. These showed the enclosure of plaintiffs' proposed operation and installations within a high metal fence with trees, lawns, and other landscaping adjacent thereto. The proposed installations indicate that plaintiffs' plant would be on a par with, if not far more presentable than, most of the industries operating in the area.

At the district court hearing, plaintiffs submitted testimony establishing that under their plan of operation there would be no burning or crushing of metal and no smoke or noxious odors would be created. They established that in the past operation of their business in Minne-

apolis a number of food distributors and similar enterprises were in close proximity without adverse effects. No waste or refuse would be stored on their premises, and there was nothing in the evidence submitted which would establish that conduct of such business would create any of the problems relating to health or sanitation which are usually attendant upon enterprises engaged in the manufacturing, canning, or packaging of foods or dairy products, and similar operations authorized for this area by defendant's zoning ordinance.

■ We are of the opinion that the trial court's determination must be affirmed. It is well settled that actions taken by a municipality under municipal zoning ordinances must bear some relationship to public health, safety, or welfare, Hawkins v. Talbot, 248 Minn. 549, 80 N. W. (2d) 863; Gunderson v. Anderson, 190 Minn. 245, 251 N. W. 515; and that such actions will not be upheld where it is established that they are arbitrary or discriminatory as applied to a particular situation. State v. Northwestern Preparatory School, Inc. 228 Minn. 363, 37 N. W. (2d) 370. They cannot rest upon an intent to make a certain area subservient to others, nor may they destroy valuable property rights solely in adherence to the esthetic concepts of municipal planning commissions. Pearce v. Village of Edina, 263 Minn. 553, 118 N. W. (2d) 659; Charnofree Corp. v. City of Miami Beach (Fla.) 76 So. (2d) 665; Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. ed. 169; 58 Am. Jur., Zoning, § 72. Where evidence reasonably supports a finding that in acting under a zoning ordinance a municipality has acted contrary to these principles, it is the duty of the court to hold such actions invalid. Pearce v. Village of Edina, *supra*; Gunderson v. Anderson, *supra*.

■ In determining whether a municipality's action in denying a property owner's application for a special building permit under relevant zoning ordinance was arbitrary, unreasonable, or discriminatory, the district court should base its findings upon credible evidence. Its function is to weigh such evidence, and where the evidence fairly establishes that factors relative to health, safety, and public welfare bear no material relationship to the action of the municipal authority in restricting property uses or in denying applications for special permits, it should invali-

date such actions. Pearce v. Village of Edina, *supra*; Patton v. City of Bellingham, 179 Wash. 566, 38 P. (2d) 364, 98 A. L. R. 1076.

Likewise, it should consider evidence relative to authorized uses and classifications of property adjacent to that involved in the proceedings, and where it finds from the evidence that restrictions imposed upon the property involved have not been made applicable to adjacent or nearby tracts within the same zoning classifications, it should not hesitate to determine that the restrictions applied to the property involved are violative of fundamental, constitutional property rights of its owner. Rowland v. City of Racine, 223 Wis. 488, 271 N. W. 36; City of Pleasant Ridge v. Cooper, 267 Mich. 603, 255 N. W. 371.

■ The functions of this court are the same as in all cases where fact questions have been determined by a trial court. Kiges v. City of St. Paul, 240 Minn. 522, 62 N. W. (2d) 363; Olsen v. City of Minneapolis, 263 Minn. 1, 115 N. W. (2d) 734; Pearce v. Village of Edina, 263 Minn. 553, 118 N. W. (2d) 659. In determining whether the evidence is sufficient to sustain the findings with respect thereto, such evidence must be considered in the light most favorable to the prevailing party. Kiges v. City of St. Paul, *supra*; Olsen v. City of Minneapolis, *supra*. Under the foregoing rule the evidence here must be deemed amply sufficient to sustain the trial court's findings that the challenged action of defendant had no relationship to public health, safety, or welfare. When evidence with reference to the actual uses of the property adjacent to plaintiffs' property is considered, it is clear that the court was justified in finding that no valid basis existed for the denial of plaintiffs' application for a permit to use their property for purposes within those authorized for the area in which it is located. While there should be no objection to a municipality's endeavors to apply esthetic considerations to plans for future development, in doing so it should be aware that where such plans involve destruction or diminution of property rights or interests, just compensation therefor should be paid to the owners whose rights or interests are thus taken for the benefit of the community as a whole.

■ Defendant has assigned a number of additional errors having reference to the reception or rejection of various items of evidence sub-

mitted at the trial. We have considered all of such assignments carefully, and have concluded that none of them are of such a material nature as to require a reversal of the order appealed from.

Affirmed.