# INLAND CONSTRUCTION COMPANY AND ANOTHER v. CITY OF BLOOMINGTON.

195 N. W. 2d 558.

March 3, 1972—No. 42883.

 

*Larkin, Hoffman, Daly, Lindgren & Danielson, James P. Larkin,* and *Robert J. Hennessey,* for appellants.

*Adrian E. Herbst,* City Attorney, and *Edward C. Tischleder,* Assistant City Attorney, for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, Kelly, and Rolloff, JJ.

KELLY, JUSTICE.

Plaintiffs-appellants, Inland Construction Company and Marvin H. Anderson Construction Company, brought this action seeking either to compel the city of Bloomington to issue a permit allowing Inland to construct a shopping center or to obtain a judicial determination that Inland can construct the center without such permit. The district court vacated a previously issued writ of mandamus and denied all relief except for its determination that Inland was entitled to a permit for construction of a "neighborhood" shopping center as opposed to a "regional" or "community" shopping center. Plaintiffs appeal from denial of their motion for a new trial. We reverse.

In July 1964, plaintiff Marvin Anderson Construction Company (hereinafter Anderson) acquired a 300-acre tract within the city of Bloomington for development purposes. A 20-acre portion of that tract at the intersection of 98th Street and Normandale Boulevard was rezoned on March 1, 1965, as a retail business district under the Bloomington Zoning Ordinance. In 1969, Inland acquired this 20-acre tract (the subject property) from Anderson. Desiring to build a shopping center, Inland then applied for a conditional-use permit. During all times pertinent to this case, Bloomington Zoning Ordinance, § 7.07, titled Retail Business Districts (B-2), was in effect. Section 7.07 I sets forth the purpose of these districts as follows:

"* * * To provide for and encourage compact centers for

retail sales and services by grouping businesses in patterns of workable relationships; to minimize the blighting influence on surrounding residential neighborhoods by limitation and control of uses permitted; to exclude highway-oriented and other businesses that would tend to disrupt the shopping center or its circulation patterns, or tend to disturb neighborhood stability."

Section 7.07 A.1, sets forth the permitted uses as follows:

"Retail shopping uses—stores and shops selling household goods over a counter or selling personal services. Included are stores selling antiques, art and school supplies, auto accessories, bakery goods, bicycles, building materials that are within completely enclosed buildings, candy, camera and photographic supplies, carpets and rugs, china and glassware, clothing and costumes, dry goods, foods, electric and household appliances, furniture, fur goods, garden supplies (year-around operation only) hardware, hobby supplies, jewelry, leather goods and luggage, motor vehicle and boat sales that are within a completely enclosed building, musical instruments, office supplies, paint and wallpaper, phonograph records, shoes, sporting goods, tobacco goods, and toys.

"Included are the following personal services: Barber shops, beauty shops, laundries and dry cleaning, photography studios, picture framing, eating and catering establishments, locksmith shops and repair incidental to sale of goods listed above."

Under B-2 zoning, certain uses are allowed if the owner acquires a "conditional use permit." The Zoning Ordinance, § 11.01 B, defines "conditional use" as follows:

"A conditional use is a use which is generally not suitable in a particular zoning district but which may, under some circumstances and with the application of certain conditions, be suitable."

For a property owner to obtain a conditional-use permit, the city council must find that certain standards are met, only two of which are of any consequence in this case:

"1. The proposed use will not cause traffic hazard or congestion.

"2. Adjacent residentially zoned land will not be adversely affected because of traffic generation, noise, glare or other nuisance characteristics." Id. § 11.13 B.1, 2.

"Planned developments" are conditional uses and are defined in part as:

"A tract of land which is developed as a unit under single or unified ownership or control and which includes two or more principal buildings." Id. § 13.37.

On April 22, 1969, the Bloomington City Council added to the list of conditional uses "[s]hopping centers." Id. § 7.07 C.23. A "shopping center" is defined as:

"A planned business development that:

"1. Contains a number of retail business uses, including at least a grocery store, a drug store, and specialty stores.

"2. Contains a number of services, such as a barber shop, beauty shop, laundry and dry cleaning depots;

"3. Serves day-to-day needs of the immediate neighborhood;

"4. Serves the general public;

"5. Is open to occupancy by competitive uses." Id. § 13.40.

The "conditional use" defined in the ordinance is more commonly referred to as a "special use permit." In this case the zoning ordinance permits retail stores without any restriction on the land in question and then requires a conditional-use permit for a shopping center on the theory that it "is a use which is generally not suitable." Zoning Ordinance, § 11.01 B. Rather obviously, a shopping center is suitable in a retail business district. It is a compatible use because the use of the land for a shopping center is no different than the retail uses permitted for that particular zone. It would be anomalous if Inland had the burden to prove that its shopping center was "suitable" when the city allows landowners to establish retail stores as a matter of right. By zoning the land for retail stores, the city stated that

it is desirable to have such stores in that particular location. Likewise, a shopping center is suitable for the location. The city's definition of a shopping center as a conditional use—i. e., a use which generally is not suitable—when applied to an area zoned for retail businesses is not the definition normally used. The following description is more apt and better fits the facts in the instant case:

"* * * [Special use permits] are designed to meet the problem which arises where certain uses, although generally compatible with the basic use classification of a particular zone, should not be permitted to be located as a matter of right in every area included within the zone because of hazards inherent in the use itself or special problems which its proposed location may present." Zylka v. City of Crystal, 283 Minn. 192, 195, 167 N. W. 2d 45, 48 (1969).

We have noted that there is considerable authority for the proposition that the city should set forth specific standards to apply to applications for special-use permits and that a denial of the permit is arbitrary and illegal when these standards are met.[1] In the instant case, once the standards set forth in the applicable provisions of the Zoning Ordinance are complied with, construction of a shopping center should be preferred over the establishment of retail stores which do not require any permit unless they are part of a "planned development" or shopping center. We need only look at the purpose clause of the provisions relating to retail business districts, § 7.07 I, to realize that a shopping center that meets all the standards for a conditional or special-use permit should actually be preferred to a retail business district which might grow without planning and without meeting those standards.

The purpose clause previously set forth indicates that zoning

---

[1] Zylka v. City of Crystal, 283 Minn. 192, 197, 167 N. W. 2d 45, 50 (1969). See, also, Golden v. City of St. Louis Park, 266 Minn. 46, 122 N. W. 2d 570 (1963); Olsen v. City of Minneapolis, 263 Minn. 1, 115 N. W. 2d 734 (1962).

for retail business districts was "[t]o provide for and encourage compact centers for retail sales and services by grouping businesses in patterns of workable relationships." Obviously, this purpose would be better accomplished by a shopping center than the establishment of retail stores on a helter-skelter basis without the planning which would normally be expected in a shopping center. It is clear that Inland could have used all the land in question for retail purposes without obtaining any permit for a conditional use if the tract did not become a "planned development" or a "shopping center." Thus, Inland could have sold off various parcels of land for retail business use and the ultimate result might have been a hodge-podge of stores that would not come close to the articulated purposes for this particular zoning and would not meet the standards the city should impose for issuance of a conditional-use permit for a planned development or shopping center. We conclude then that any shopping center proposed in an area zoned for retail business would be generally suitable and compatible in that area under the Zoning Ordinance of the city and that a landowner intending to construct a shopping center in a retail business district does not have the burden of proving suitability or compatibility. This does not mean that any reasonable standards imposed by the ordinance would not have to be met and a conditional-use permit secured in order to construct a shopping center.

In Westling v. City of St. Louis Park, 284 Minn. 351, 170 N. W. 2d 218 (1969), this court indicated that the applicant for a special-use permit (which is the same as the conditional-use permit referred to in this case) has the burden of proof, but that it is a much lighter burden than that imposed on an applicant for a use variance. Adverting to a discussion by the New Jersey Supreme Court of the distinctions between a special permit and a variance, we stated (284 Minn. 356, 170 N. W. 2d 221):

"* * * In a later case, the New Jersey Supreme Court emphasized the fact that one who seeks a special permit where the proposed purpose has been legislatively sanctioned has a much

lighter burden than one seeking a use variance. The court's view was summarized as follows:

" 'The basic difference between a use which is a special exception and one which requires a variance is that the former is legislatively *permitted* in a zone subject to controls whereas the latter is legislatively *prohibited* but may be allowed for special reasons.' Verona, Inc. v. Mayor and Council of West Caldwell, 49 N. J. 274, 282, 229 A. 2d 651, 655."

In the instant case the use of the property as a shopping center was legislatively permitted since the property was zoned for retail business. Every use that the shopping center would make of the property was a permitted use with the exception of a proposed filling station, a use which was not objected to before the council or in the court below and apparently is not an issue in this case. If Inland had any burden of proof, it was that of showing that the planned shopping center would meet the standards required for issuance of a conditional-use permit. This should have been a light burden of proof because it was possible that the same use of the property might be made without meeting any standards so long as it was not a "planned development" or "shopping center."

In the spring of 1964, when Anderson entered into negotiations for the purchase of the 300-acre tract of land in southwestern Bloomington, the president of Anderson met with the Bloomington city planner. They discussed the development of the tract as a planned development which would include residential areas, parks, multiple dwellings, a shopping center, and businesses. The city planner referred to an unofficial guideline map which had been prepared by the planning commission. This map had never been adopted by the city council. It was considered to be simply a guide rather than a rigid plan and has been modified from time to time. The map indicated by a symbol that the subject property was a potential location for a "neighborhood convenience center." It also had a symbol for "community shopping center" and

"neighborhood convenience centers" in various other locations. These neighborhood convenience centers and community shopping centers were not defined on the plan, nor does the Bloomington Zoning Ordinance define or make any distinction as to the types of shopping centers.

In January 1965, Anderson discussed with the city planning commission a plan which set aside approximately 20 acres for a shopping center of about 200,000 square feet. A center of this size on a tract of 20 acres can meet all space and other similar set-back requirements of the city ordinances. The subject property was to be located immediately to the southeast of the intersection of 98th Street and Normandale Boulevard. Both of these streets are classified as arterial streets and are defined by the city public works department as major streets that carry a high volume of traffic a considerable distance. Streets designated as Rich Road and Normandale Highlands Drive were platted along the eastern and southern boundaries of the subject property. The overall plan for the 300-acre site worked out between Anderson and the city's planning staff called for the dedication of streets; the dedication of 33.8 acres of park land; the zoning of an 8.8-acre site immediately to the north of the subject property across 98th Street as B-1 (general business uses); and the zoning of a 35-acre tract immediately south of the subject property and across Normandale Highlands Road as R-4 (permitting apartment buildings). The plan as worked out called for platted lots to be used for double bungalows on Rich Road along the east end of subject property. At the time of the trial Anderson still owned these lots.

It can be seen that the plan for the 300-acre tract and the shopping center was such that the shopping center would not face directly any single-family residential lot; that the land to the south of the subject property was to be used for apartment buildings; the property on the east was to be used for double bungalows; the shopping center was to be bounded on the north by 98th Street and across 98th Street to the north the land was

zoned for a business district. On the west the shopping center was to be bounded by Normandale Boulevard, an arterial street. Immediately opposite the southeastern corner of the subject property were some lots that contained a city water tower. These plans were discussed with the planning commission at a series of hearings, at which time Anderson advised that the proposed shopping center site would be used for retail business covering an area of approximately 200,000 square feet.

In January 1965, the planning commission approved the over-all plan and recommended rezoning of subject property to B-2 for a shopping center. In February 1965, the Bloomington city council heard an application of Anderson for rezoning of the subject property for use as a shopping center and of the area to the south of the shopping center for multiple dwellings. At that time the council was advised that a junior department store, a drug store, a grocery store, possibly a bank, and a number of uses were being proposed for the shopping center site.

The council meeting minutes show the following concerning the shopping center site:

"The Council was requested by Marvin H. Anderson to consider approving rezoning of property at 98th and Normandale from R-2 to B-2 for a shopping center.

"The Planning Commission at its meeting of January 26 approved the rezoning.

"Motion was made by Crain, seconded by Malone, and all present voting yea, to instruct the Attorney to draft an ordinance effecting this change."

The ordinance was thereafter adopted. At the time this ordinance was adopted, the shopping center was treated as a conditional use in a B-2 zone on the theory that it was a planned development. As previously pointed out, a shopping center was specifically added as a conditional use under § 7.07 C.23 in 1969.

Following the approval of its plans for the 300 acres, Anderson dedicated 33.8 acres for parks and developed streets and installed utilities in the area, including the site for the proposed

shopping center. Before any homes were built, a sign, still present at the time of trial, was placed on the site showing its intended use for a shopping center.

Late in 1969, Anderson sold the tract to Inland Construction Company, which proceeded in general conformance with Anderson's plans. Soon thereafter, Inland was advised by the city that it would have to apply for a conditional-use permit since the planned use was a "shopping center." On March 26, 1970, Inland went before the city planning commission, which voted 6-0 to recommend to the city council that the plan be approved subject to approval by the engineering department with respect to traffic and drainage; to approval by the commission and council of final site and building plans; and to installation of underground utilities. The council, however, voted 4-0 to reject the plan because it could not affirmatively find:

"1. The proposed use will not cause traffic hazard or congestion.

"2. Adjacent residentially zoned land will not be adversely affected because of traffic generation, noise, glare or other nuisance characteristics." Zoning Ordinance, § 11.13 B.1, 2.

Inland then brought this action in the district court. The trial court found that the subject property was generally suitable for a shopping center of a neighborhood convenience type but that the action of the council was not arbitrary as to the specific proposal made by the applicant, and that the applicant should be permitted to make a new application for a neighborhood convenience type of shopping center. On appeal to this court, Inland raises several issues. We concern ourselves with only two issues because they are dispositive of the case.

The first issue is: Was the action of the city council arbitrary in denying Inland's application for a conditional-use permit where the basis for that action was that the council could not make findings (a) that the proposed use would not cause traffic hazard or congestion, and (b) that adjacent residentially zoned land would not be adversely affected because of traffic genera-

tion, noise, glare, or other nuisance characteristics? The second issue is: In denying Inland's application for a conditional-use permit, did the city council act for reasons not within the scope of any of the provisions of the Zoning Ordinance?

The record discloses the following evidence bearing upon these issues: Inland, after acquiring the subject property from Anderson, had a plan prepared for the shopping center site. This plan called for an enclosed mall; a W. T. Grant Company department store with an area of 102,000 square feet; and a grocery store and other shops with areas totaling about 87,000 square feet. As stated, Inland filed an application for a conditional-use permit, and the city council referred it to the planning commission for its recommendation. In the meantime, Inland also met with the planning and engineering departments of the city to work out details of traffic flow, access, and landscaping. The city planning director, Robert Webster, was furnished with a staff report which included the recommendations of the various city departments. The report of the city engineering department stated: "Land use had been anticipated and can be accommodated with appropriate street and traffic provisions * * *."

The staff report contained a statement by Webster which is partially set out in the footnote because it zeros in on the problems in this case.[2] Mr. Webster pointed out in this report that,

2 "This is an application for a conditional use permit for a shopping center of about 190,000 square feet * * *. The Planning Commission will recall at the time the overall plan for the Anderson Development was submitted, the property in question was rezoned for a shopping center. * * * The applicant has submitted a plan indicating a major tenant to be W. T. Grant with 102,000 square feet of floor area. The plan also includes a drug store, some small shops, a 21,000 square foot supermarket and various other shops and office spaces. * * * The hang up that we have in the department is the type of center being proposed. The ordinance does not permit distinctions between neighborhood, community and regional centers, and does not permit determination of the staff as to the tenants and type of retail stores to be located in a shopping center. I would refer the Planning Commission to the most recent Urban Land Institute report. * * * The Urban Land Institute

although he objected to the major tenant, the city had no ability to control a major tenant in a shopping center. He also pointed out that the ordinance did not permit distinctions between neighborhood, community, or regional centers, nor did it permit determination as to the tenants and types of retail stores to be located in a shopping center. We are impressed with the professional character of this report and the frankness displayed by the city planner.

Inland made a presentation to the planning commission with respect to the type of buildings being planned, traffic pattern,

---

indicates 'In all cases a shopping center's type is determined by its major tenant. Neither a site area nor square feet of structure determines the type of center,' and I think the reason for this quotation in their report is that typically nationwide zoning ordinances define shopping centers by neighborhood, community, area, regional or various other names, and the control of the location of these commercial shopping centers is done by limiting the square feet either as a minimum or maximum building area, or limiting the acreage of the center, again either by minimum or maximum requirements. In Urban Land Institute's continuing study over the past 20 years, they have become convinced that no such regulation really controls a shopping center.

\* \* \* \* \*

"Sometimes we are overly optimistic about purchasing power and the ability of the community to support retail shopping facilities, and perhaps Bloomington may have to be satisfied with the type of stores being built in our City. It does seem improbable to assume that a junior department store with high style, quality merchandise would not succeed in our community, particularly in an area where the home values range from $50 to $100,000 and all of us hope for junior department stores such as Powers or such department stores such as McDonalds in California rather than a proliferation of stores such as Montgomery Wards, Target, Murphy, G.E.M. and W. T. Grant; and unless W. T. Grant changes its entire technique and procedures of marketing, and unless they are different in this location than on the West Coast, I just cannot imagine them locating a store in this area. In any event, it turns out to me to be a personal disappointment if the shopping center does proceed, and again, strictly within the ordinance, in this matter. It should be reiterated that these comments are probably superfluous in that we have no ability to control a major tenant in a shopping center."

grading, and other details. The testimony in the court below shows that the commission was satisfied that the traffic could be handled as the area was well served by arterial streets. The planning commission voted 6-0 to recommend that the city council approve the conditional-use permit for the shopping center subject to approval from the engineering department on traffic, drainage, etc.; approval by the planning commission and city council on final site and building plans; and installation of underground utilities. The application was then forwarded to the Bloomington city council for hearing, primarily for the purpose of considering the land use rather than specific plans. Meanwhile, Inland's representatives continued to work with the various city departments and accepted their recommendations with respect to traffic access, screening, and other details. Inland gave up five separate pieces of land in order to achieve appropriate traffic control as requested by the city departments.

At the hearing before the council, a representative of a residents' association objected to the shopping center, stating that it would create a big traffic problem; that the merchandising level was bargain-priced and not in harmony with the neighborhood; that the center was not a neighborhood convenience center; and that residents felt the area should be developed into a "high-style" shopping center. He presented a petition, signed by 476 people representing 273 homes, opposing the center and asking that traffic patterns be planned to eliminate nonresident traffic on the streets of the single-family dwelling portion of the area. The representatives of Inland discussed the proposed center and pointed out that the design of the center met the zoning requirements of the city with respect to size; that the loading areas would be screened; that much of the parking area would be out of view; and that most of the parking area and much of the building would not be visible from the single-family residences. It was also pointed out that the access points to the parking lots were designed to comply with the request of the traffic and engineering departments of the city. While neighbors expressed the opin-

ion that traffic would be funneled into the residential area from Rich Road, Sam Hobbs, the city's director of public works, indicated that the plan would not funnel traffic into the residential area. It was pointed out that the exits into Rich Road had been planned at the request of the city engineer. Some of the council members expressed their opinions that the center would draw traffic and that they could not find that the center would not cause traffic hazard or congestion. A motion was made and duly passed that the council deny the application because it was not able to find affirmatively that the proposed use would not cause traffic hazard or congestion and that the adjacent residentially zoned land would not be adversely affected because of traffic generation, glare, noise, or other nuisance characteristics.

It is undisputed that Inland had the right to build as a permitted use without council approval a W. T. Grant Co. department store of 102,000 square feet, which would be the same as the one in the shopping center plan, on 10 acres of the 20-acre site. The balance of the site could have been developed under the ordinance for various retail uses similar to those in the proposed center.

As we have pointed out, the burden of proof on the issue of traffic and nuisance factors should be a very light burden of proof in this case because all those factors would have been present if the same or similar uses had been made as permitted under the ordinance. The same traffic ultimately would have been drawn to the area by the W. T. Grant Co. store if it had been built initially without being a part of a shopping center and had later become a part of a complex of retail stores. But whatever burden of proof the applicants had, it should have been met when they made all their plans in accordance with recommendations of the city engineering and planning departments with respect to traffic access and when the engineering department reported that the land use had been anticipated and could be accommodated with appropriate street and traffic provisions. Mr. Webster also testified that the fact that more traffic would

be drawn by a W. T. Grant Co. store than another store would not mean that it would draw more traffic into the residential areas to the east of the subject property. Mr. Hobbs, general supervisor of the public works department, which includes the engineering and traffic departments, testified that he and the city's traffic department considered not only the square footage of retail space, but also the uses, and that in his opinion, the traffic that might be generated by the proposed shopping center could be "adequately handled" and would not be funneled into the residential district. The plan for accommodating traffic in the center itself was in accordance with the recommendations of the city departments. It is difficult to believe that Inland did not meet any burden of proof it might have had in connection with traffic congestion in light of the fact that it was planned for by the city's own experts who were of the opinion that it could be adequately handled and that the streets would accommodate the traffic.

As to the council's inability to find that the residents would not be adversely affected by noise, glare, and other nuisance factors, here again we find that the use for the 300-acre tract was originally planned by Anderson and ultimately by Inland in conjunction with the city's departments and the planning commission itself. The evidence discloses that the shopping center would be buffered on the north by another business district and an arterial street; on the east by a number of lots that would contain townhouses, all of which were owned by Anderson. The southeast corner of the shopping center would be buffered by 5 city-owned lots which contain a city water tank. On the south, it would be buffered by apartment building sites. The parking lot portion of the shopping center was to be lower than the rest of the property and a berm some 4 to 8 feet in height was planned for the east and southerly side of the center. This berm and the topography of the ground together with landscaping would screen the area from the single-family residences. Lights in the area were to be aimed from the outside toward the inside

of the subject property so as not to cause glare in the residential area. With these plans and the buffering of the subject property from the surrounding areas, it seems obvious that the applicant more than sustained the burden of proof on this issue.

The second issue arises primarily because of the court's finding and memorandum. The city council did not specifically state any reason or make any findings for denying the conditional-use permit other than finding that it was unable to find that there would be no traffic congestion or noise, glare, or other nuisance factors as far as the residents were concerned. The court below concluded that the action of the council was more broadly based and that the council had more in mind than the narrow stated grounds and was concerned with other requirements of the Zoning Ordinance; the general purpose of the ordinance as set forth in § 4.01;[3] and the general welfare of the entire city. The court went on to state:

"The Court recognizes that the decision in this case is not as clear-cut or definitive as might be desired, but has concluded that no more satisfactory disposition is possible. Under all of the facts and circumstances of the case, a shopping center of a neighborhood convenience type is to be permitted at the corner of 98th and Normandale. The application of plaintiffs here under con-

---

[3] Section 4.01 provides: "Chapters 4 through 13, inclusive, have been enacted in order to protect and promote the public health, safety, and general welfare of the people of Bloomington. Specifically, the provisions are designed to achieve amongst others the following objectives:

"1) Adequate light, air and safety from fire for occupants of structures.

"2) Conservation of the value of land and buildings.

"3) A balanced tax base as between residential, commercial, and industrial uses.

"4) Avoidance of business failures through improper location.

"5) A minimum of congestion in the public streets.

"6) Compatibility between different land uses.

"7) Reasonable standards to which structures and uses shall conform."

sideration was not for a shopping center of that type, but for a much larger community or regional center—a conclusion made necessary because of plaintiffs' inclusion of a department store or a 'junior department store' as one of the 'shoppes'. An inherent concomitant of such a center is a magnification and multiplication of the problems inherent in a neighborhood center. Indeed, the problems of the proposed center differ not only in degree but in kind from those the City is prepared to cope with in the development of this 'neighborhood' in the larger community of the City of Bloomington."

It may be possible that the city council had more in mind than the narrow stated grounds, but we are unable to find it in the record. A careful study of the minutes of the council meetings and of the testimony fails to produce any grounds for denying the application for a conditional-use permit other than the ones stated in the motion for denial of the application. The problem with the trial court's determination that the city council could be required to permit a shopping center of a neighborhood convenience type on the subject property but was not required to permit a larger community or regional center, is that there is nothing in the Zoning Ordinance that allows for any such distinction and a denial of the application for the conditional-use permit must be based on the fact that some standard of the Zoning Ordinance was not met by the applicant's plans. The ordinance does not set forth as a standard that the applicant must have plans for a neighborhood convenience shopping center, nor does the ordinance contain any definition of such a shopping center as compared to a regional or community shopping center. From a reading of the entire transcript we cannot conclude that there is a well-known distinction between these types of shopping centers other than that a regional or community shopping center would draw from a larger area than a neighborhood shopping center. In fact, we find no adequate definition for "neighborhood," "community," or "regional" in any of the testimony.

The ordinance does contain a measure of control over the size

of shopping centers. Initially, the site itself may be limited in size. Here the city zoned the subject property of 20 acres for retail business use. The ordinance would permit a site of 20 acres to have 200,000 square feet of retail space. The city could have originally zoned only 10 acres of the subject property for retail business use and the square-feet area permitted for retail use would thus have been substantially reduced. Here Inland is only requesting a permit for about 189,000 square feet of retail space, which is well within the limitation of 200,000 square feet contemplated for the subject property.

We recognize that the site size, which limits the square feet available for retail space, is not the only factor determining the drawing power of a shopping center; but, as was pointed out in the staff report, the Zoning Ordinance does not permit the city to determine what tenants and types of retail stores are to be located in a shopping center. While we recognize the desirability of according the city council some latitude in determining whether to grant or deny applications for conditional-use permits, we have noted that there should be some standards. There is nothing in the ordinance that gives to the city council the power to deny a conditional-use permit because the tenant might be W. T. Grant Company.

We conclude that the evidence amply supports Inland's position that all standards of the city's Zoning Ordinance were met by its plans for the subject property[4] and that if the permit was denied on the ground that the plan contemplated a community or regional shopping center instead of a neighborhood shopping center, that ground did not constitute a standard under the Zoning Ordinance. Inland was therefore entitled to the conditional-use permit, and the council's action in denying the application therefor was arbitrary.

If the city council considered any factors other than the standards imposed by the ordinance, it did not articulate such factors

---

[4] Any findings by the trial court inconsistent with this opinion are set aside under Rule 52.01, Rules of Civil Procedure.

in findings of fact specifying the reasons on which its decision was based. Under Zylka v. City of Crystal, *supra*, the failure of the council to record any legally sufficient basis for its determination made a prima facie showing of arbitrariness inevitable. Accordingly, the trial court erred in sustaining the council's denial of the conditional-use permit when the court based its findings on reasons not articulated by the council.

Reversed and remanded with instructions that judgment be entered for appellants compelling the city of Bloomington to issue a conditional-use permit for a shopping center as applied for by appellant Inland subject to (1) the approval from the city engineering department relative to traffic, drainage, etc.; (2) the approval by the planning commission and city council of final site and building plans including (1) uniform signs design, (b) architectural treatment, and (c) pedestrian walkways; and (3) installation of underground utilities.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.