# METRO 500, INC. v. CITY OF BROOKLYN PARK.

211 N. W. 2d 358.

September 21, 1973—No. 43257.

*Robert J. Miller, O. C. Adamson II,* and *J. Richard Bland,* for appellant.

*Howard, LeFevere, Lefler, Hamilton & Pearson, Curtis A. Pearson,* and *J. Dennis O'Brien,* for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, and Kelly, JJ. Reconsidered on the record en banc.

KELLY, JUSTICE.

Plaintiff brought this action for a mandatory injunction to compel the city of Brooklyn Park to issue a special-use permit for the construction of a gasoline filling station on commercially zoned property. The district court refused to grant the injunction and plaintiff appealed.

The principal issue is whether the municipality acted arbitrarily and unreasonably in the denial of the special-use permit on the basis that the number of filling stations in the area is completely unbalanced with other commercial uses.

Plaintiff, Metro 500, Inc., operates a number of gasoline filling stations throughout the Minneapolis metropolitan area. On August 18, 1969, it contracted to purchase property in Brooklyn Park for the purpose of building another cut-rate gas station. The property is located in the middle of a block on Osseo Road (renamed Brooklyn Boulevard) south of its intersection with Zane Avenue North. At the location of this property, Osseo Road is a heavily traveled, six-lane state highway. The property, which is located in the core of the developing Brooklyn Park downtown area, is zoned for commercial use.

A major brand gasoline station exists on each corner of the nearby Zane Avenue intersection and a total of 8 service stations are located within 7/10 of a mile surrounding the property. Other uses in the immediate vicinity include a car wash, a shopping center, a nightclub, a grocery store, a car dealer, a dental clinic, several apartment buildings, various retail shops, and a number and variety of public eating places or restaurants.

Brooklyn Park requires a special-use permit for utilizing a building or premises as a gasoline station within a commercial zone.[1] A special-use permit is to be issued under the city's ordinances if the use will be in harmony with the intent and purpose of the zoning code and the use will not be detrimental to the health, safety, or general welfare of the community; nor will cause serious traffic hazards; nor will seriously depreciate sur-

---

[1] Brooklyn Park Zoning Code, § 29.02, subd. C.

rounding property values.[2] After receiving approval from the Minnesota Highway Department for two curb cuts along Osseo Road, Metro 500 designed a building in conformance with requirements of the building inspector. The exterior style of the building was designed to be compatible with a nightclub under construction on the adjacent property. The plans also utilized a house and storage shed which were presently on the property. The existing house was proposed as the general offices of Metro 500 and the shed was to become a warehouse for storing oil to be used at that station. The building inspector recommended approval of the proposed service station.

According to the requisite procedure, Metro 500 then submitted its petition to the special permit committee of the city's planning commission. The committee made no recommendations on the petition. Thereafter, a public hearing was held before the entire planning commission after which the commission recommended approval to the city council. Those voting in opposition to the permit stated that the proposed use was not proper for the area, it would create a bad image for the city, and additional gas stations were not needed on Osseo Road. In a memorandum to the city council, the city manager, after reviewing the commission's recommendation, also questioned the need for an additional gas station. However, no market study on the question had been conducted and the population of the city had increased by 10,000 since 1965 while only one service station had been built since 1966.

A public hearing on Metro 500's permit application was also held before the city council. Metro 500 again indicated its willingness to modify its plans to conform to the city's desires, including the utilization or elimination of any existing structures presently on the property. A petition of 19 area businessmen in opposition to the permit was presented stating that other uses would be more beneficial to the general welfare of the community and pointing out the present vacancies in other stations in the

---

[2] Brooklyn Park Code of Ordinances, § 34.12.

area. No evidence was offered to the council that the proposed station could create noise, light, fire, or public health problems. No testimony was received that the station would increase traffic hazards or affect area property values. On November 24, 1969, the city council adopted a resolution denying Metro 500 a special-use permit.[3] That resolution did not include a finding that an

---

[3] This resolution reads as follows: "WHEREAS, Chapter 462 of the Minnesota Statutes authorize the City Council, with the aid and assistance of the City Planning Commission, to carry on municipal planning activities for guiding future development and improvement of our community, and

"WHEREAS, the purpose of planning and zoning as well as of the ordinances enacted to implement the city plans is to promote and protect the public health, safety, morals and general welfare of the total community, and

"WHEREAS, municipal regulation, and particularly special permits, are designed to use guides and standards as well as provide the City Council with some discretion to ascertain how the community will develop and to take into account prior development and future goals, and

"WHEREAS, certain uses are allowed subject to the granting of a special permit because such uses may not be compatible with the area, may create special problems, or can result in a poor balance of community services, and

"WHEREAS, Osseo Road from Zane Avenue North south to the Brooklyn Center city limits, represents the best and most developable commercial property in the City, and

"WHEREAS, general commercial uses and neighborhood services are needed in this general area including clothing stores, food outlets, service facilities and many others including gasoline filling stations, and

"WHEREAS, there are seven filling stations within a distance of 6/10th of a mile, indicating that this particular commercial use and neighborhood service is most adequately provided for the residents of the area, and

"WHEREAS, good planning and zoning should not provide for a street having a surplus of one type of use and that such development uses commercial property to the detriment of other commercial services needed, and

"WHEREAS, the applicant has indicated a desire to use structures on the property for storage purposes which are more generally located in an industrial or light industrial zoned area,

additional filling station in the area would seriously depreciate surrounding property values or that it would cause serious traffic hazards. The main thrust of the resolution was that there were already too many service stations in the area and the subject property should be reserved for some other use. Shortly before Metro 500's petition was denied, one had been granted to the Holiday station although other applications at about the same time had been similarly denied.

Metro 500 thereafter brought this suit. At trial, the three expert witnesses disagreed whether the proposed use would depreciate surrounding property values. A comprehensive plan for future development of Brooklyn Park was admitted over the objection of Metro 500. At the time of the trial, the plan had not been adopted.

We have held that where a zoning ordinance specifies standards for the approval of a special-use permit which an applicant fully complies with, a denial of the permit is arbitrary as a matter of law. Inland Const. Co. v. City of Bloomington, 292 Minn. 374, 195 N. W. 2d 558 (1972); Zylka v. City of Crystal, 283 Minn. 192, 167 N. W. 2d 45 (1969). A denial under such circumstances would be improper even though the city council may be the final authority for issuance of permits. Enright v. City of Bloomington, 295 Minn. 186, 203 N. W. 2d 396 (1973). In Zylka

---

"Now, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF BROOKLYN PARK,

"1. Special Use Permit Request No. 1969-373 is denied because of the foregoing findings.

"2. The number of filling stations in the area is completely unbalanced with other commercial uses.

"3. The amount of commercially zoned property in the City ready for development in this the heart of the City, is limited and an over concentration of one type of use discourages development needed to provide neighborhood services to residents of the City and the immediate area.

"4. The Site plan fails to comply with Section 65.04, Subdivision f. of the City Code."

v. City of Crystal, we further observed (283 Minn. 196, 167 N. W. 2d 49):

"* * * Where the ordinance does not specify standards, as is usually the case when final authority to determine whether a permit shall be granted is retained by the council, an arbitrary denial may be found by a reviewing court when * * * the requested use is compatible with the basic use authorized within the particular zone and does not endanger the public health or safety or the general welfare of the area affected or the community as a whole."

In a most recent case, Main Realty, Inc. v. Pagel, 296 Minn. 362, 365, 208 N. W. 2d 758, 760 (1973), we stated:

"* * * In recent years a number of cases have articulated the perimeters of municipal authority in granting or denying permits of this kind. In Zylka v. City of Crystal, 283 Minn. 192, 199, 167 N. W. 2d 45, 51 (1969), we alluded to 'the danger of permitting the council to deny a special-use permit without contemporaneous findings or reasons and then permit its members after several months of thought to present reasons perhaps totally unrelated to the actual reasons for denying the permit.' Where the requested use is consistent with those authorized by the zoning ordinance, the permit may not be denied unless there is a showing that the public health, safety, or welfare is in danger. Twin City Red Barn, Inc. v. City of St. Paul, 291 Minn. 548, 192 N. W. 2d 189 (1971). We have held that the failure of the council to record contemporaneously a legally sufficient basis for its determination constitutes a prima facie showing of arbitrariness. Inland Const. Co. v. City of Bloomington, 292 Minn. 374, 392, 195 N. W. 2d 558, 569 (1972).

"We are not impressed by the vague references in the council minutes to the 'health, welfare, and safety for the people of Woodbury' as justification for denying the permit without an articulation by the council of the factual basis and reasons for that determination. Enright v. City of Bloomington, 295 Minn.

186, 190, 203 N. W. 2d 396, 399 (1973); Hay v. Township of Grow, 296 Minn. 1, 206 N. W. 2d 19 (1973)."

Brooklyn Park Code of Ordinances, § 34.12, subd. 4, does not make the issuance of a special-use permit mandatory upon the meeting of certain standards, but provides only that the council may grant a permit after considering various factors. It reads:

"In considering applications for special permits under this Code, the Village Council shall consider the advice and recommendations of the Planning Commission and the effect of the proposed use upon the health, safety and welfare of occupants of surrounding lands, existing and anticipated traffic conditions, including parking facilities on adjacent streets, and the effect of values of property in the surrounding area. If it shall determine by resolution that the proposed use will not be detrimental to the health, safety, or general welfare of the community nor will cause serious traffic congestion nor hazard, nor will seriously depreciate surrounding property values, and that the same is in harmony with the general purpose and intent of this Ordinance, and the Zoning Code, the Council *may* grant such permit and may impose conditions and safe-guards therein by a favorable vote of a majority of all members of the Council." (Italics supplied.)

When a governing body denies an application for a special-use permit, the factual basis and reasons for the denial must be in some manner recorded contemporaneously with its action. Without such a safeguard, a council may arbitrarily deny a permit and later, after the denial is challenged, state reasons which are completely unconnected with the actual basis for the denial. Main Realty, Inc. v. Pagel, *supra.*

In the present case, the council stated its reasons in its resolution denying the permit. This is therefore not a case where the absence of any recorded findings or reasons makes the denial prima facie arbitrary. The principal reasons given by the city council were that there were already sufficient gasoline stations

in the area and by permitting another station, it would create an overconcentration of the use to the detriment of developing other services needed in the community. In addition, the resolution stated that Metro 500 desired to use the property for storage of oil which is more generally located in an industrial zone.

We have held that it would be error for a trial court to sustain a denial of a special-use permit based on reasons not articulated by the city council. Inland Const. Co. v. City of Bloomington, 292 Minn. 374, 391, 195 N. W. 2d 558, 569 (1972). Accordingly, our consideration is limited to determining whether this additional gasoline station is compatible within this particular zone and whether it would adversely affect the public health, safety, or general welfare of Brooklyn Park.

It is difficult to conceive of a use which would be more compatible with the basic use authorized in this area. It is zoned for commercial uses and presently contains many varied retail shops and services. Among the businesses in the vicinity of the subject property are a number of gasoline stations, to which similar permits were granted. The plans for the station conform to the requirements of the city, and the station was designed to be architecturally consistent with adjacent buildings. In addition, testimony at trial indicated that the gasoline station would be compatible with uses in the vicinity.

Similarly, we do not believe that the proposed use would endanger the public health, safety, or general welfare of the community. The council did not state, and it was not established at trial, that the gasoline station would create traffic hazards or that the curb cuts would be unsafe. Furthermore, it was not established that the station would create noise, light, fire, or health problems.

The sole basis upon which the council could have concluded contemporaneously with the denial of the permit that the proposed use would be adverse to the general welfare of the community would be that there were already too many gasoline stations in the area. We hold that the limitation of the number

of one type of use in a particular area does not bear a sufficient relationship to the public health, safety, or general welfare of a community and that the denial of a special-use permit for such a reason is therefore arbitrary. The number and type of gasoline stations and other permissible uses within a zone should be determined by the interaction of the economic law of supply and demand rather than by the collective opinion of the members of a municipal governing body concerning the needs of the community. Texaco, Inc. v. Board of Adjustment, 73 N. J. Super. 313, 179 A. 2d 768 (1962); Cunningham v. Planning Board, 157 N. Y. S. 2d 698 (Sup. Ct. 1956), modified on other grounds, 4 App. Div. 2d 313, 164 N. Y. S. 2d 601 (1957). The control of uses authorized within a zone must have a substantial relationship to the public good and not result from a desire to resist the operation of economic laws. See, Olsen v. City of Minneapolis, 263 Minn. 1, 13, 115 N. W. 2d 734, 742 (1962). To conclude otherwise would lead to government by the whims of men rather than by law.

In the present case, much reliance has been placed on the comprehensive plan for future development of Brooklyn Park. It is sufficient to observe that neither at the time of the denial of the special-use permit nor at the trial challenging its denial had the plan been adopted.

The only additional reason given by the council for denying Metro 500's permit was that one of the structures was intended to be used for warehousing of oil which would be improper in the commercial zone. A review of the record discloses that Metro 500 intended only to store that amount of oil necessary for its operation of the one station at that location. It repeatedly stated its willingness to conform to such a condition and also that the house and storage shed would be torn down if required by the city for construction of the gasoline station.

We are aware that the trial court in a memorandum specifically made a part of his findings stated:

"The Court has concluded and finds on the basis of this entire record, as did the Council, that favorable action on plaintiff's application would result in too many filling stations in this area, that it would seriously depreciate surrounding property values, and that it is not in harmony with the general purpose and intent of the Ordinance and Zoning Code of Brooklyn Park. The Court finds and concludes, as did the Council, (See Zoning Ordinance Exhibit P, Section 34.12, Subdivisions 1-5 inclusive) that favorable action on plaintiff's application would adversely affect the health, safety and welfare of the occupants of surrounding lands, existing and anticipated traffic conditions, and will be detrimental to the health, safety and general welfare of the community and will cause serious traffic congestion and hazard.

"The decision of the Court, like that of the Council, is based expressly and explicitly on the finding, *inter alia,* that one more filling station in this area on Osseo Road at this time just will not do."

We cannot find any evidence that would support a finding by the trial court that the council, contemporaneously with the denial of the special permit, found or gave as reasons for that denial that the proposed filling station would seriously depreciate surrounding property values or would cause serious traffic congestion. It follows that any finding by the trial court to the contrary would be clearly erroneous. Nor are we impressed by vague references to the general purpose and intent of the zoning code or similar references to the adverse effect on the health, safety, and welfare of the occupants of surrounding lands.

We make no prediction as to what our decision might be if the city's zoning code empowered the city council to deny permits because of imbalances that might be created by having too many filling stations, restaurants, nightclubs, grocery stores, or whatever in a given area, assuming some reasonable standards for such decisions were contained in the code and that a comprehensive plan for future development was adopted by the city. This court recognizes that cities must have a measure of flexibility,

but that some guidelines and standards must be required to the end that all our citizens have equal opportunities and do not have to entirely rely on the whim and caprice of those in power.

Reversed and remanded with instructions to enter judgment for Metro 500 compelling the city of Brooklyn Park to issue the special-use permit subject to the conditions previously agreed to by Metro 500 if required by the council.

ROGOSHESKE, JUSTICE (dissenting).

I would affirm. I cannot agree that the record compels a finding as a matter of law that essentially the sole basis for the council's denial of the special-use permit was to arbitrarily prefer one commercial use over the other or, as stated in the majority opinion, that "there were already too many service stations in the area." Findings of the trial court, amplified and analyzed in the comprehensive memorandum, make clear that the council did not act arbitrarily but based its denial on reasons not only articulated in its formal denial but supplemented by the testimony submitted to the trial court.

Summarized, the trial court found that the council's denial was based upon its conclusions that an additional filling station in the area would adversely affect (1) adjoining property values, (2) existing and anticipated traffic hazards, and (3) the general purposes and intent of its zoning plan by perpetuating and increasing an imbalance of the use of lands zoned for commercial purposes in the area. Even though the council may not have formally articulated all of the reasons for its denial, our responsibility is to review the evidentiary support for the findings of the trial court. Where, as here, they are not clearly erroneous, we are obliged to affirm.

While it is surely desirable for the governing body in denying a special-use permit to record contemporaneously with its action *all* the reasons for such denial, we have never before suggested that the failure to do so amounted to more than a prima facie showing of arbitrariness. The majority opinion appears to now hold that where a governing body undertakes to contemporane-

ously and formally express reasons, but fails to include a legally sufficient reason, the action taken is arbitrary as a matter of law despite trial court findings that legally sufficient reasons for the action taken are established by the evidence. This, in my opinion, is too inflexible a rule as it represents an extension of Zylka v. City of Crystal, 283 Minn. 192, 167 N. W. 2d 45 (1969), and would restrict judicial review, both at trial and on appeal, to only those reasons formally articulated by the council contemporaneously with its action to issue or deny a special-use permit.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.