**RDNT, LLC, Appellant,**

v.

**CITY OF BLOOMINGTON, Respondent.**

No. A13–0310.

Supreme Court of Minnesota.

March 18, 2015.

Tamara O'Neill Moreland, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, for appellant.

Paul D. Reuvers, Stephanie A. Angolkar, Iverson Reuvers Condon, Bloomington, MN, for respondent.

Jonathan W. Lips, Natalie Wyatt–Brown, Halleland Habicht P.A., Minneapolis, MN; and Benjamin T. Peltier, Saint Paul, MN, for amicus curiae Aging Services of Minnesota.

John M. Baker, Katherine M. Swenson, Greene Espel PLLP, Minneapolis, MN, for amicus curiae Minnesota Chapter of the American Planning Association.

Mark R. Whitmore, Daniel R. Olson, Bassford Remele, P.A., Minneapolis, MN, for amicus curiae Ebenezer Society.

Susan L. Naughton, League of Minnesota Cities, Saint Paul, MN, for amicus curiae League of Minnesota Cities.

Terrance W. Moore, Carol R.M. Moss, Hellmuth & Johnson, PLLC, Edina, MN, for amicus curiae LifeSpan of Minnesota, Inc.

Kyle D. White, Saint Paul, MN, for amicus curiae National Alliance on Mental Illness of Minnesota.

OPINION

LILLEHAUG, Justice.

RDNT, LLC asks us to hold that the City of Bloomington's decision to deny RDNT's conditional use permit application was unreasonable, arbitrary, and capricious, and to hold that the City did not properly consider RDNT's proposed traffic-mitigating conditions. We hold that the City's decision was not unreasonable, arbitrary, or capricious, as the City based its decision on a legally and factually sufficient ground: that the proposed use would be injurious to the surrounding neighborhood or otherwise harm the public health, safety, and welfare. We also hold that the City's determination that RDNT's proposed efforts to mitigate traffic were insufficient was not unreasonable, arbitrary, or capricious.

I.

RDNT, LLC ("RDNT") owns the Martin Luther Care Campus ("Campus"), lo-

cated in Bloomington. The Campus consists of two buildings: the Martin Luther Care Center and Meadow Woods Assisted Living. The Campus provides a variety of services, including assisted living, memory care, skilled nursing, adult day care, and transitional care.

On September 27, 2011, RDNT submitted an application to the City for a conditional use permit. In its application, RDNT sought to expand its existing assisted living services by adding a third building to the Campus. RDNT stated that the expansion would allow those served by its existing transitional care unit to transfer into the assisted living units, thereby allowing them to "age in place."

At the time, the Campus consisted of 137 units in its skilled nursing facility and 117 units in its assisted living facility. The proposed addition would be three stories tall and contain 67 "catered living units," increasing the total units from 254 to 321: a 26 percent increase. It would also increase the staff from 186 to 202 employees: an 8 percent increase. And it would increase the total building square footage from 198,209 square feet to 321,264 square feet: a 62 percent increase.

On November 3, 2011, RDNT presented its application to the Bloomington Planning Commission in a meeting open to public comment. Numerous citizens spoke about the proposed expansion, with many voicing concerns about increased traffic. The Planning Commission unanimously voted to recommend denial of the conditional use permit application. The Planning Commission adopted the view of its staff report that the proposed expansion would violate the City's comprehensive plan because: 1) it is not adjacent to an arterial or collector street; 2) it is not in close proximity to transit, amenities, and services; and 3) it would not preserve the character of the surrounding low density,

single family neighborhood. The Planning Commission also adopted the staff's view that the proposed use would violate the City's conditional use permit ordinance because it would be injurious to the surrounding neighborhood or otherwise harm the public health, safety, and welfare. The staff based its views on estimated increases in traffic and on the size, density, and design of the proposed building.

The City Council met on November 21, 2011, to consider the application. Among other materials, the City Council reviewed traffic studies from two different experts estimating the future traffic volume that would be generated by the proposed expansion.

SRF Consulting Group, Inc. ("SRF"), hired by the City, conducted the first study. Using data collected on its own and by City staff, SRF calculated that the Campus generated 1,145 trips on an average day, resulting in 4.50 trips per bed. That figure exceeded the standard trip generation rate for similar facilities, which is 2.66 trips per bed. SRF relied on the 4.50 trips per bed rate in order to provide a "conservative estimate." SRF then examined the extent to which the proposed expansion would increase traffic. Using the "actual (collected) trip generation rates," SRF determined that the expansion would increase the daily number of trips from 1,145 to 1,447: a 26 percent increase. SRF concluded that the Campus generated trips on the higher end compared to similar facilities. SRF also concluded that "existing neighborhood roadways and intersections have sufficient capacity to accommodate the additional vehicles expected from the ... expansion and no additional roadway improvements would be necessary to accommodate the expansion as proposed." SRF noted that delays at East Old Shakopee Road and

East 98th Street would likely increase, but the increase would be "minimal."

URS Corporation ("URS"), retained by RDNT, conducted the second study. In evaluating the effect of the expansion on the number of trips generated, URS acknowledged that SRF's collected trip generation rate was calculated using an "accepted method." However, URS contended that SRF based its rate on incorrect assumptions. URS contended that the new addition would share trips with the current site and would thus not increase traffic at the same rate that the existing use generated. URS further asserted that because the new facility would offer a "lower intensity of care," similar to the existing assisted living facility, it would require fewer employees and trips than a more intensive-care facility, like the existing skilled nursing facility. Instead, URS determined that the industry standard rate of 2.74 trips per bed should apply to the new expansion. This would result in an additional 184 daily trips, for a total of 1,329 daily trips: a 16 percent increase. URS also evaluated the Campus's existing Transportation Demand Management Program ("TDMP"), which included a variety of measures designed to reduce the number of new and existing trips generated by the Campus. URS concluded that a more robust TDMP could further reduce the number of trips generated by the Campus by up to 70 trips per day. URS also determined that working with major vendors could reduce truck trips by six to eight trips per day.

In addition to the expert studies, the City Council received information from the neighborhood. Those in favor of the expansion highlighted the individual and community benefits of assisted living for the elderly. Those in opposition focused primarily on the effect that the Campus's existing traffic had on noise, safety, home values, and the general character of the neighborhood. Public comments given at the City Council meeting echoed the written concerns, with the primary emphasis on traffic issues.

By a vote of four to three, the City Council passed a resolution to deny RDNT's application for a conditional use permit. The resolution set forth four reasons for the denial. The first three reasons related to conflicts with different comprehensive plan provisions. The fourth reason related to the City conditional use permit ordinance, which requires that the "proposed use will not be injurious to the surrounding neighborhood or otherwise harm the public health, safety and welfare." Bloomington, Minn., Code of Ordinances ch. 21, art. V, div. A, § 21.501.04(e)(5) (2014).[1] The City Council found that the increase in square footage rendered the expanded Campus "incompatible with the scale and character of the surrounding low density, single family neighborhood." The City Council found that most structures in the neighborhood would be one-fifth or less than the size of the new addition. It also cited increased traffic volumes, projected to total between 1,377 and 1,447 daily trips, as injurious or otherwise harmful. The City Council further found that the traffic volume would be "over three and one half times the average daily trips" than if the 13–acre site were instead developed to a low density of three units per acre. And it found the various traffic concerns submitted by the public to be "credible and consistent with the traffic studies presented and staff analysis of the application." Finally, the City Council found RDNT's TDMP to be insufficient to

1. *Available at* http://bloomingtonmn.gov/clerk/    city-charter-and-code-ordinances.

avoid the injury, given the location and nature of the Campus.

RDNT filed a complaint and petition for alternative writ of mandamus with the Hennepin County District Court. On cross-motions for summary judgment, the district court granted summary judgment to RDNT and reversed the denial of RDNT's application. The district court held that, for each of the four reasons given, the City "misapplied certain standards, misrepresented the impact of certain studies, and appeared to ignore evidence to the contrary." Specifically, as to the fourth reason, the district court held that the record was insufficient to support a finding that the proposed use would injure the neighborhood or harm the community. The district court criticized the City's reliance on the SRF study and the generalized neighborhood opposition.

The City appealed. In an unpublished opinion, the court of appeals reversed, holding that the City appropriately exercised its discretion. *RDNT, LLC v. City of Bloomington,* No. A13–0310, 2014 WL 30382 (Minn.App. Jan. 6, 2014). Of the four reasons given by the City for its decision, the court of appeals held that three were factually and legally sufficient.[2] *Id.* at *2–9. On the fourth reason identified by the City, involving injury to the neighborhood and harm to the public health, safety, and welfare, the court of appeals held that the City ordinance from which that standard was derived was legal-ly sufficient, and that the City was within its discretion in finding that the proposed use violated this ordinance, based on the square-footage and traffic evidence. *Id.* at *9.

We granted RDNT's petition for review.

## II.

RDNT argues that each of the City's four reasons for denying RDNT's conditional use permit application was arbitrary and capricious. We limit our consideration to the City's fourth reason: that the proposed use would violate subdivision (e)(5) of the City's conditional use permit ordinance.[3]

■ "[T]he interpretation of an existing ordinance is a question of law for the court." *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980). We review a question of law de novo. *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.,* 664 N.W.2d 303, 311 (Minn.2003).

■ We will reverse a governing body's decision regarding a conditional use permit application if the governing body acted unreasonably, arbitrarily, or capriciously. *Schwardt v. Cnty. of Watonwan,* 656 N.W.2d 383, 386 (Minn.2003).[4] There are two steps in determining whether a city's denial was unreasonable, arbitrary, or capricious. First, we must determine if the reasons given by the city were legally

---

2. The court did not address one of the comprehensive plan provisions considered by the City. *RDNT,* 2014 WL 30382 at *8.

3. Because we hold this ground to be legally and factually sufficient, we do not need to address the three other grounds upon which the City based its decision. *See Hubbard Broad., Inc. v. City of Afton,* 323 N.W.2d 757, 765 n. 4 (Minn.1982) ("Not all of the reasons stated need be legally sufficient and supported by facts in the record.").

4. Since zoning laws are a restriction on the use of private property, a landowner whose application for a conditional use permit has been denied has a lighter burden than one who challenges approval of a permit. *Bd. of Supervisors of Benton Twp. v. Carver Cnty. Bd. of Comm'rs,* 302 Minn. 493, 499, 225 N.W.2d 815, 819 (1975).

sufficient. *C.R. Invs., Inc. v. Vill. of Shoreview,* 304 N.W.2d 320, 325 (Minn. 1981). Second, if the reasons given are legally sufficient, we must determine if the reasons had a factual basis in the record. *Id.*

### A.

We first address whether the City's conditional use permit ordinance is legally sufficient. The City's ordinance states in relevant part: "The following findings must be made prior to the approval of a conditional use permit: ... (5) The proposed use will not be injurious to the surrounding neighborhood or otherwise harm the public health, safety and welfare." Bloomington, Minn., Code of Ordinances ch. 21, art. V, div. A, § 21.501.04(e)(5) (2014). We have long held that a city may deny a conditional use permit application if the proposed use endangers "the public health or safety or the general welfare of the area affected or the community as a whole." *Zylka v. City of Crystal,* 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969). However, we have also held that the "absence of more express standards makes denial of a special-use permit more, not less, vulnerable to a finding of arbitrariness." *Hay v. Twp. of Grow,* 296 Minn. 1, 6, 206 N.W.2d 19, 22–23 (1973).

Thus, we hold that the City ordinance is legally sufficient, but will examine the factual basis for the City's findings more closely than we would under a less subjective standard.

### B.

Second, we address whether the City had a reasonable factual basis to determine that the proposed use would injure the surrounding neighborhood or otherwise harm the public health, safety, and welfare. We hold that it did.

The City and RDNT offer conflicting evidence about the effect the proposed use would have on traffic. Upon review of a city's decision, our function is "not to weigh the evidence, but to review the record to determine whether there was legal evidence to support the zoning authority's decision." *Barton Contracting Co. v. City of Afton,* 268 N.W.2d 712, 718 (Minn.1978). With expert witnesses, we do not "attempt to weigh the credibility of conflicting experts, but instead review the record to ensure that the decision ... had support in the record." *Billy Graham Evangelistic Ass'n v. City of Minneapolis,* 667 N.W.2d 117, 124 (Minn.2003). In other words, courts should ordinarily defer to a city's judgment on conflicting evidence. *See White Bear Docking & Storage, Inc. v. City of White Bear Lake,* 324 N.W.2d 174, 176 (Minn.1982).

Even so, it is not necessary for us in this case to defer to the City's projections to determine whether it had a reasonable factual basis. The City estimated that the daily number of trips would increase after the expansion from 1,145 to somewhere between 1,377 and 1,447, while RDNT estimated that the number of trips would be 1,259, taking the TDMP into account. Even by RDNT's projection, the expansion would add over 100 daily trips. Further, the City's engineer estimated that average traffic counts for a residential street were between 300 to 500 trips, and that the public tends to complain once traffic increases to 1,000 trips per day on such a street. Thus, regardless of which estimate is more accurate, there is a factual basis in the record for the City to find that the proposed expansion would increase traffic on already busy streets.

The evidence relied on by the City to find that the increase would injure the neighborhood is distinguishable from the evidence we held to be insufficient in *C.R.*

*Investments v. Village of Shoreview,* 304 N.W.2d 320, 325 (Minn.1981). In that case the only evidence of a traffic control problem on a certain road was "the statement of one council member that he had been told of a problem existing at one intersection and his opinion that additional housing units might aggravate that problem." *Id.* Here, neighbors gave concrete testimony about how the increase would exacerbate existing traffic conditions. For instance, one neighbor wrote about vehicles driving through crosswalks near the school, even though the crossing guards had their flags out. Another neighbor wrote about observing vehicles that sped and made U-turns. Yet another neighbor wrote about the incredible amount of "traffic and noise" due to the large number of delivery trucks, emergency vehicles, shuttle buses, passenger cars, and garbage vehicles. Thus, RDNT's argument that the City relied on vague concerns for public health and welfare is simply unfounded: the City had in hand multiple traffic studies, the City engineer's testimony regarding specific data, and detailed factual complaints from the neighborhood.

Still, RDNT argues that because the streets are not near capacity, as both the City's engineer and SRF acknowledge, the City had no factual basis to deny the application. For this argument, RDNT relies on *Chanhassen Estates,* in which we held that the evidence was insufficient to reverse the grant of a conditional use permit where the neighborhood organization only offered "non-specific testimony that the proposed [use] poses potential traffic haz-

ards at the intersection," while the city offered "the city engineer's testimony that the intersection could handle the anticipated traffic." *Chanhassen Estates Residents Ass'n v. City of Chanhassen,* 342 N.W.2d 335, 340 (Minn.1984). *Chanhassen Estates* is distinguishable. In that case, the city engineer concluded that the intersection could handle the traffic, and we deferred to that conclusion in declining to reverse the city's decision to grant a conditional use permit. *Id.* Here, although the City's engineer concluded the streets were not at capacity, the City relied on specific evidence—traffic studies, average street numbers, and neighborhood testimony—to conclude that the proposed use would nonetheless injure or otherwise harm the neighborhood. Not unreasonably, the City determined that street capacity alone was not dispositive as to whether an increase in traffic injures the neighborhood or otherwise harms the public health, safety, and welfare. The fact that a *street* could physically handle more traffic does not determine whether the *neighborhood* or the *public* could handle more traffic. To paraphrase one of the City's planners: this is not a capacity issue, it is a livability issue. On that issue, we cannot say the City acted unreasonably, arbitrarily, or capriciously.

Because of the traffic studies, the City engineer's testimony, and the neighborhood testimony, we hold that the City had a sufficient factual basis to determine that the increase in traffic would injure the neighborhood or otherwise harm the public health, safety, and welfare.[5]

5. We appreciate the participation of, and the information furnished by, the amici who serve or represent some of the most vulnerable Minnesotans. While the amici explain cogently the difficulties providers encounter in siting, constructing, and operating care facilities, our task in this case, like any other, is not to make legislative policy but to interpret and apply existing statutes, ordinances, and precedents. *See Dahlin v. Kroening,* 796 N.W.2d 503, 508 (Minn.2011) (considering competing public policy arguments related to judgment renewals and holding that "policy-related issues are best left to the Legislature. When interpreting the statutes, it is our role to rely on what the Legislature intended over what

## III.

■ RDNT also contends that the City unreasonably, arbitrarily, and capriciously determined that RDNT's proposed mitigation efforts would be insufficient to alleviate the traffic issue. We disagree.

■ Minnesota Statutes § 462.3595 provides: "Conditional uses may be approved by the governing body ... *by a showing by the applicant* that the standards and criteria stated in the ordinance will be satisfied." Minn.Stat. § 462.3595, subd. 1 (2014) (emphasis added). Thus, the burden was on RDNT to show that it could satisfy the standards specified by ordinance. If a conditional use permit applicant demonstrates to the governing body that imposing a reasonable condition would eliminate any conflict with the ordinance's standards and criteria, it follows that the governing body's subsequent denial would be arbitrary. *See Zylka v. City of Crystal,* 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969) ("A denial would be arbitrary ... if it was established that all of the standards specified by the ordinance as a condition to granting the permit have been met." (footnote omitted)).

RDNT argues that the City should have suggested or imposed mitigating conditions. We have held that a city's decision to deny a conditional use permit was arbitrary in part because "there was no attempt made, either by the opponents or the council, to suggest or impose conditions" that would mitigate problems with the development. *Minnetonka Congregation of Jehovah's Witnesses, Inc. v. Svee,* 303 Minn. 79, 85–86, 226 N.W.2d 306, 309 (1975). But we decided *Svee* before the Legislature enacted section 462.3595, Act of Mar. 22, 1982, ch. 507, § 24, 1982 Minn. Laws 587, 594 (codified at Minn.Stat. § 462.3595 (2014)), which places the burden on the applicant to satisfy the standards and criteria in the ordinance. To the extent there is any conflict between *Svee* and the later-enacted statute, the plain language of the statute controls.

Regardless of *Svee,* RDNT relies on *C.R. Investments* to argue that the City did not adequately consider RDNT's proposed mitigating conditions. *See C.R. Invs., Inc. v. Vill. of Shoreview,* 304 N.W.2d 320 (Minn.1981). In that case, the village council had been informed that a traffic hazard could be eliminated by furnishing turn-around areas in the driveways. *Id.* at 325. The village council ignored that proposed reasonable condition. *Id.* Taking the ignored reasonable condition into consideration, we found no evidence warranting an inference that the traffic aggravation would be "substantial," and thus held the village's decision to be arbitrary. *Id.*

Unlike the village in *C.R. Investments,* which ignored the applicant's reasonable proposal, *see id.,* the record before us shows that the City adequately considered the proposed mitigating conditions in several ways. In rejecting RDNT's application, the City concluded that the "minimization of the trip volume by the proposed Traffic Demand Management Plan is insufficient to avoid injury to the public health, welfare and safety of the residential neighborhood." In SRF's expert report, heavily relied on by the City, SRF considered the TDMP. SRF admitted, taking the addition into account, that the TDMP had "the potential to reduce the facility trips by approximately 70 trips per day." However, SRF cautioned that the "effectiveness of these strategies is difficult to quantify without post implementation data to support this forecast reduction; caution should be demonstrat-

may appear to be supported by public policy.").

ed when estimating the actual impact to trip reduction." SRF also warned that "TDMPs typically tend to be the most effective in central business districts or in heavily transit-oriented developments versus the suburb-type development that this is."[6] Even if URS's estimates regarding traffic generation and the TDMP's effectiveness were accurate, the expansion would still add over 100 daily trips. Thus, the City had a reasonable factual basis to determine that the proposal would not alleviate the traffic concerns.

Accordingly, based on the record, the City did not act unreasonably, arbitrarily, or capriciously when it denied RDNT's conditional use permit application.

Affirmed.

DIETZEN, J., took no part in the consideration or decision of this case.

ANDERSON, Justice (concurring).

I agree with the majority's conclusion that the City did not act arbitrarily or capriciously by denying the conditional use permit as "injurious to the surrounding neighborhood or otherwise harm[ful to] the public health, safety and welfare." I am not impressed with the strength of the City's argument, and am particularly struck by the willingness of the City to ignore the long-standing use of the property by RDNT, a use that predates the arrival of the neighbors now complaining about traffic. That said, given our deferential standard of review, I would affirm on the grounds advanced by the majority opinion.

I write separately, however, to address an alarming argument advanced by the City that the majority, properly, does not reach in affirming the court of appeals. That argument is that the City may properly deny a conditional use permit when the proposed use is in conflict with its comprehensive plan. My concurring opinion is prompted by significant uncertainty in our statutory framework and confusion in our case law concerning the role of comprehensive plans. Although not addressed by the parties here, there are also constitutional implications lurking behind the insistence of the City that a conditional use permit may be denied for any comprehensive plan violation.

I.

To understand why we should be concerned with the City's argument, some history of land use planning is necessary. Early zoning lacked a formal planning element.[1] Although comprehensive planning

---

**6.** One of the council members expressed similar concerns:

> I appreciate all the effort that you're talking about trying to minimize, and I just—I'm looking at a bus stop six blocks away in the Minnesota winter going to a nursing home. I just don't see that some of those measures are going to have a big enough impact to bring these numbers down to anywhere where they're acceptable.

**1.** The Supreme Court found zoning constitutional under the police power in *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). It is worth noting that *Euclid* marked a shift from an exclusion-based system of regulation to a gov-

ernance model. As one commentator has said, after *Euclid* most land uses shifted from "presum[ptively] legitimate, unless specifically shown to be dangerous or unsuitable to the neighborhood," to "presum[ptively] illegitimate unless they conformed to the master plan's specifications." Eric R. Claeys, *Euclid Lives ? The Uneasy Legacy of Progressivism in Zoning,* 73 Fordham L. Rev. 731, 741 (2004). A charitable view of zoning regulation is that it advances public safety and the general welfare; a less charitable view of zoning is that it keeps "undesirable" elements out of the community and limits the rights of property owners to use their property as they see fit without the government having to pay property owners for taking those rights. Indeed, the

was advocated as early as the 1920s, modern planning did not exist until the 1940s. 4 Kenneth H. Young, *Anderson's American Law of Zoning* § 23.02 (4th ed.1996). Early state zoning enabling acts were generally enacted without corresponding planning legislation, and zoning regulations were carried out with no large-scale plan. *Id.* § 23.01. Even when planning became a standard part of zoning statutes, its function was not fully explained. The Standard Zoning Enabling Act, which formed the basis of many state zoning acts, stated that zoning regulations "shall be made in accordance with a comprehensive plan" with the goal of preventing "haphazard or piece-meal zoning." Advisory Comm. on Zoning, U.S. Dep't of Commerce, *A Standard State Zoning Enabling Act* 6 & n. 22 (rev. ed.1926). Although the Act required a "comprehensive study," *id.* at 6 n. 22, it provided no other guidance on what should be included in the plan, or how it should be implemented. Another early model law provided that the comprehensive plan exists "solely to aid the planning board in the performance of its duties." Edward M. Bassett et al., *Model Laws for Planning Cities, Counties, and States* 40 (1935). This general framework has been retained in some modern planning statutes. *See, e.g.,* 65 Ill. Comp. Stat. Ann. 5/11–12–6 (West 2012) (providing that a comprehensive plan "shall be advisory and in and of itself shall not be construed to regulate or control the use of private property in any way" unless implemented by enactment into an ordinance).

Under this traditional approach, and in my view, the better approach, courts have construed comprehensive plans as advisory documents that cannot guide specific land-use decisions. *See, e.g., City of Gaines-*

*ville v. Cone,* 365 So.2d 737, 739 (Fla.Dist. Ct.App.1978) ("[The comprehensive plan was] to serve merely as a guide for future decisions relating to rezoning petitions and growth and development of the City."); *Urrutia v. Blaine Cnty.,* 134 Idaho 353, 2 P.3d 738, 742–43 (2000) ("[A] comprehensive plan does not operate as legally controlling zoning law, but rather serves to guide and advise the governmental agencies responsible for making zoning decisions."); *Borsuk v. Town of St. John,* 820 N.E.2d 118, 121 (Ind.2005) ("A comprehensive plan is 'a guide to community development rather than an instrument of land-use control.'" (quoting 4 Young, *supra,* § 23.15)); *Iverson v. Zoning Bd.,* 22 Md. App. 265, 322 A.2d 569, 571 (1974) ("A master or general plan . . . is but a guide or scheme recommended to the legislative branch in order to enable them to make intelligent decisions with respect to the adoption of zoning classifications." (citing *Pattey v. Bd. of Cnty. Comm'rs,* 271 Md. 352, 317 A.2d 142, 147 (1974))); *Forks Twp. Bd. of Sup'rs v. George Calantoni & Sons, Inc.,* 6 Pa.Cmwlth. 521, 297 A.2d 164, 166–67 (1972) ("The comprehensive plan is a general guideline to the legislative body of the municipality for its consideration of the municipality's program of land utilization and the needs and desires of the community.").

A modern trend, however, is to give greater legal effect to the comprehensive plan. *See, e.g., Baker v. City of Milwaukie,* 271 Or. 500, 533 P.2d 772, 779 (1975) (concluding the comprehensive plan "is the controlling land use planning instrument for a city"); *Town of E. Greenwich v. Narragansett Elec. Co.,* 651 A.2d 725, 727 (R.I.1994) (stating the comprehensive plan "establishes a binding framework or blue-

---

*Euclid* court characterized apartments, which were adversely affected by the Village of Euclid zoning ordinance, as "mere parasite[s]."

*Euclid,* 272 U.S. at 394, 47 S.Ct. 114. Regardless, the constitutionality of zoning ordinances is no longer seriously debated.

print that dictates town and city promulgation of conforming zoning and planning ordinances"). But notwithstanding the increased prominence of the comprehensive plan, most courts have refrained from allowing municipalities to use comprehensive plans to make specific land-use decisions.[2] Instead, these courts view zoning ordinances and other specific regulations—which are adopted in accordance with the comprehensive plan—as giving legal effect to the comprehensive plan's general goals. *See, e.g., Forks Twp. Bd. of Sup'rs*, 297 A.2d at 167 ("[A] comprehensive plan is abstract and recommendatory; whereas the zoning ordinance is specific and regulatory."); *cf. Baker*, 533 P.2d at 777 ("[U]pon adopting a comprehensive plan, [a city] ha[s] a duty to implement that plan through the enactment of zoning ordinances in accordance therewith.") The Washington Supreme Court explains this distinction in *Shelton v. City of Bellevue*, 73 Wash.2d 28, 435 P.2d 949, 953 (1968):

> Municipal "zoning" ... is, in effect, a part of and an end result or product of effective municipal "planning," for it is through the medium of enacted and enforceable zoning regulations that the aims and objectives of the land-use-classification facet of over-all municipal "planning" may be carried to fruition. Because an ad hoc, piecemeal approach to municipal "zoning" lends itself more readily to arbitrary, capricious, unreasonable, or spot zoning situations, it follows that there must be a direct and tangible link between over-all municipal

"planning" and over-all municipal "zoning."

Under this view, a municipality may not deny a permit merely because the proposed use is contrary to the comprehensive plan. *See City of Louisville v. Bd. of Educ.*, 343 S.W.2d 394, 395 (Ky.1961) ("The Master Plan authority deals with the *general character* and location of buildings and not with specific uses to which a building may be put."); *Platt v. City of New York*, 276 A.D. 873, 93 N.Y.S.2d 738, 739 (1949) (stating that a city may not deny building permits merely because a property is located on land designated as a proposed roadway on the city's master plan); *see also Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 469 F.Supp. 836, 867 (N.D.Ill.1979) ("[A] zoning decision inconsistent with the comprehensive plan does not make the rezoned property inconsistent with surrounding uses."), *aff'd*, 616 F.2d 1006 (7th Cir.1980). The Idaho Supreme Court warned of the danger of allowing such overreach:

> In determining whether the land "conforms to the comprehensive plan" for the purposes of a subdivision application, the Board is simply required to look at all facets of the comprehensive plan and assure that the land fits within all of the various considerations set forth in the plan. It is to be expected that the land to be subdivided may not agree with all provisions in the comprehensive plan, but a more specific analysis, resulting in denial of a subdivision application based

---

**2.** I also note that many of the cases that have allowed consideration of comprehensive plans when making specific land-use decisions have cited explicit statutory authority. *See Windward Marina, L.L.C. v. City of Destin*, 743 So.2d 635, 637 (Fla.Dist.Ct.App.1999) (citing Fla. Stat. § 163.3194(1)(a) (1997)); *GATRI v. Blane*, 88 Hawai'i 108, 962 P.2d 367, 372–73 (1998) (citing Haw.Rev.Stat. § 205A–26 (1993)); *W. Main Assocs. v. City of Bellevue*,

49 Wash.App. 513, 742 P.2d 1266, 1273 (1987) (citing Wash. Rev.Code § 35A.63.080). *But see Madison River R.V. Ltd. v. Town of Ennis*, 298 Mont. 91, 994 P.2d 1098, 1102 (2000) (stating proposed use must comply with comprehensive plan without citing statutory authority). As demonstrated below, no such explicit statutory authority exists in Minnesota.

solely on non-compliance with the comprehensive plan elevates the plan to the level of legally controlling zoning law. Such a result *affords the Board unbounded discretion in examining a subdivision application and allows the Board to effectively re-zone land based on the general language in the comprehensive plan.*

*Urrutia,* 2 P.3d at 743–44 (emphasis added). Using the comprehensive plan as a tool for specific zoning decisions invites, rather than minimizes, arbitrary and discriminatory municipal practices. Thus, the history of American municipal planning provides little support, and properly so, for use of the comprehensive plan as a vehicle for denying conditional use applications.

## II.

Historical and current planning legislation in Minnesota also counsels against using comprehensive plans to make specific land-use decisions. The Legislature has never made clear the legal effect of comprehensive plans and has equivocated on the issue on several occasions. In 1929 the Legislature authorized municipalities to adopt zoning ordinances, and also stated that municipalities "may acquire or prepare and adopt a comprehensive plan for the future physical development and improvement of such city or village, in accordance with the [zoning] regulations made as aforesaid." Act of April 12, 1929, ch. 176, § 1, 1929 Minn. Laws 172, 172 (repealed 1965). The comprehensive plan was subordinate to zoning regulations because the plain language of the statute required the plan to be adopted "in accordance with" those regulations.

In 1965, noting that "municipalities are faced with mounting problems in providing means of guiding future development of land," the Legislature enacted a more extensive municipal planning act. Act of May 22, 1965, ch. 670, 1965 Minn. Laws 995 (codified as amended at Minn.Stat. §§ 462.351–.365 (2014)). The act authorizes "comprehensive municipal planning activities for guiding the future development and improvement of the municipality." Minn.Stat. § 462.353, subd. 1. Unlike the 1929 legislation, the 1965 act seemingly envisions that zoning regulations will conform to the comprehensive plan. The act provides that after completion of the comprehensive plan, the municipality may "put[ ] the plan ... into effect" by enacting zoning ordinances or other regulations. Minn.Stat. § 462.356, subd. 1; *see also* Minn.Stat. § 462.357, subd. 2(a) (stating that the planning agency may propose zoning ordinances based on a "land use plan," which may be included within the comprehensive plan, *see* Minn.Stat. § 462.352, subd. 5). The act also notes that "[m]unicipal planning ... enables other public and private agencies to plan their activities in harmony with the municipality's plans." Minn.Stat. § 462.351. But the act does not establish the comprehensive plan as a binding legal document; a municipality outside the purview of the metropolitan planning act, Minn.Stat. §§ 473.851–71 (2014), is not required to create a comprehensive plan, and most references to the comprehensive plan are accompanied by the permissive "may" rather than the mandatory "shall." *See, e.g.,* Minn.Stat. § 462.353, subd. 1 ("A municipality *may* carry on comprehensive municipal planning activities....") (emphasis added); *see also* Minn.Stat. § 462.352, subd. 5 (defining "comprehensive municipal plan" as a tool for "guiding" private and public development). The 1965 act also requires the *municipality* to comply with the comprehensive plan but is silent on whether the plan is legally binding on *property owners* (suggesting it is not). *See* Minn.Stat. § 462.356, subd. 2.

The 1976 metropolitan planning act went a step further, mandating comprehensive plans for municipalities (including the City of Bloomington) within the seven-county metropolitan area. Minn.Stat. § 473.858, subd. 1; *see also* Minn.Stat. § 473.859, subd. 1 (outlining comprehensive plan requirements). The 1976 act also requires metropolitan-area municipalities to adopt and implement "official controls"—including zoning ordinances—to carry out the comprehensive plan. Minn.Stat. §§ 473.859, subd. 4, 473.865; *see* Minn. Stat. § 473.852, subd. 9 (defining "Official controls"). Importantly, the act prohibits official controls that conflict with the comprehensive plan. Minn.Stat. § 473.865, subd. 2. These provisions suggest that the comprehensive plan may carry more legal significance in the metropolitan area than it does in greater Minnesota.

But the Legislature has continued to vacillate as to the legal weight accorded to comprehensive planning, both in Minnesota Statutes chapter 462 (greater Minnesota) and chapter 473 (metropolitan area). In 1985 the Legislature amended Minn. Stat. §§ 462.357, subd. 2, and 473.858, subd. 1, to include: "[i]f the comprehensive municipal plan is in conflict with the zoning ordinance, the zoning ordinance supersedes the plan." Act of May 6, 1985, ch. 62, §§ 3–4, 1985 Minn. Laws 160, 161–62.[3] This formulation seemingly answered the question of legal significance: the zoning ordinance, not the comprehensive plan, is the legally operative document because it "codifies" the comprehensive plan. This makes sense given the generic, goal-oriented nature of the comprehensive plan and the specific nature of zoning ordinances, and because zoning-ordinance superiority is broadly consistent with jurisprudence elsewhere.

These amendments, however, were short lived. In 1995, the amendment to Minn. Stat. § 473.858 was replaced with the following: "If the comprehensive municipal plan is in conflict with the zoning ordinance, the zoning ordinance *shall be brought into conformance with the plan....*" Act of May 17, 1995, ch. 176, § 5, 1995 Minn. Laws 593, 594–95 (emphasis added). The Legislature also replaced the 1985 amendment to section 462.357, subdivision 2, with a provision that is remarkably vague: "The plan must provide guidelines for the timing and sequence of the adoption of official controls to ensure planned, orderly, and staged development and redevelopment consistent with the plan."[4] Act of May 30, 1997, ch. 202, art. 4, § 11, 1997 Minn. Laws 1493, 1574–75 (codified as amended at Minn.Stat. § 462.357, subd. 2(c)).

Not only do the 1995/1997 amendments suggest once again that the comprehensive plan supersedes zoning regulations, but they also eliminate the guidance provided by the 1985 amendments as to how comprehensive plans should be used.[5] The

---

3. The 1985 amendment to the metropolitan planning act is especially curious because it modified the section that *introduces* the comprehensive plan requirement, Minn. Stat. § 473.858, rather than the section that *implements* the plan, Minn.Stat. § 473.865. Further, section 473.865, subdivision 2 (which has never been amended since its enactment in 1976), states that zoning ordinances and other official controls may not conflict with the comprehensive plan, which seems to contradict the amendment to section 473.858.

4. Though not at issue here, the county planning enabling act contains the same vague language as the municipal planning enabling act. *See* Minn.Stat. § 394.24, subd. 1 (2014). However, the county act also provides that an adopted comprehensive plan *"must* be the basis for official controls." Minn.Stat. § 394.23 (2014) (emphasis added).

5. While it is clear that zoning ordinances are supposed to be brought into line with the comprehensive plan, what is less clear is what happens when these requirements are not met

American Planning Association has noted a "significant gap" between Minnesota's statutes authorizing or mandating a comprehensive plan and the controls afforded to municipalities in order to implement the plan. Am. Planning Ass'n, *Minnesota's Planning and Zoning Enabling Laws: Analysis and Options for Reform* 1 (rev. draft 2013).[6] The unclear relationship between the authorization and implementation statutes creates "ambiguity and uncertainty." *Id.* At least some Minnesota practitioners agreed when evaluating the 1995 amendments to the Metropolitan Planning Act, and noted the potential for municipal overreach:

> Applications for subdivisions, conditional use permits, variances, and other flexible devices will most likely be evaluated to determine if they are consistent with the comprehensive plan.... Because many portions of comprehensive plans are generally loosely drafted, and can be interpreted to mean almost whatever the city wishes to argue, the reference to the comprehensive plan as a reason for denial is often difficult to overcome.

Michael S. Dove, Steven J. Vatndal & Bruce D. Malkerson, *Whose Land Is It Anyway? Zoning and Land Use Regulations*, app. at 5 (Minn. State Bar Ass'n Continuing Legal Educ., June 1998).

Even under the current legislative framework, neither the municipal nor the metropolitan planning act supports using a comprehensive plan to grant or deny a conditional use application. Although the Legislature has given municipalities broad authority to create "standards and criteria" for granting or denying a conditional use, Minn.Stat. § 462.3595, subd. 1, the comprehensive plan may be used only in specific ways under the planning acts. The plan must contain "objectives, policies, standards and programs to guide public and private land use, development, redevelopment and preservation." Minn.Stat. § 473.859, subd. 1; *see* Minn.Stat. § 462.352, subd. 5 (providing similar requirements for comprehensive plans in greater Minnesota). The generality of the comprehensive plan belies the notion that it is legally controlling when making specific land-use decisions. Additionally, the plan may be implemented only by adopting zoning ordinances and other regulations that conform with the plan. Minn.Stat. § 473.865; *see* Minn.Stat. § 462.356, subd. 1. Neither planning act provides or even implies that the comprehensive plan may be implemented in the way done by the City here.

### III.

Unfortunately, it is not only the Legislature that has made hash out of the intersection of comprehensive planning, zoning, and property rights law; our case law is similarly equivocal on what standard should be used to grant or deny a conditional use permit in this context. In *Zylka*

---

and whether the local ordinances still control. Although this situation was presented in *Mendota Golf, LLP v. City of Mendota Heights*, we did not resolve the issue because the property owner conceded that "comprehensive plans are intended to 'trump' inconsistent local ordinances." 708 N.W.2d 162, 173 n. 6 (Minn. 2006) (internal quotation marks omitted). We remanded the case to the city to address the inconsistency between the comprehensive plan and the zoning ordinance. *Id.* at 183. But we did not say there, nor have we said anywhere else, notwithstanding the current statutory preference for comprehensive plans, that a municipality is specifically authorized to ignore a zoning ordinance and enforce the comprehensive plan.

6. *Available at* http://www.mnapa.com/documents/_2013/Draft-White-Paper-Minnesota-Planning-and-Zoning-Enabling-Laws-Analysis-and-Options-for-Reform.pdf.

*v. City of Crystal,* we established two scenarios under which a city council's decision to deny a conditional use permit is arbitrary and must be reversed: (1) when all the standards prescribed by the ordinance have been met; or (2) if the ordinance presents no standards, when the "requested use is compatible with the basic use authorized within the particular zone and does not endanger the public health or safety or the general welfare of the area affected or the community as a whole." 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969) (affirming the district court's invalidation of the city's denial of the permit because the plaintiff complied with all construction regulations; the city's conditional use ordinance provided no standards; and the city council did not demonstrate a danger to public health, safety, or general welfare). A conditional use ordinance does not provide standards if it merely supplies various factors for the city council's consideration. *Metro 500, Inc. v. City of Brooklyn Park,* 297 Minn. 294, 300, 211 N.W.2d 358, 362 (1973).[7] While reasons for denying a permit need not necessarily be "precise and specific," they may not be "so general as to compel an inference that the board was evading its responsibility to give reasons." *Corwine v. Crow Wing Cnty.,* 309 Minn. 345, 353, 244 N.W.2d 482, 486 (1976).

The City claims that because its local ordinances require adherence to the comprehensive plan, violations of the comprehensive plan are sufficient to support a denial of a conditional use permit. This reasoning invites a host of practical and legal issues. For one thing, comprehensive plans are too long and too general (too "comprehensive") to provide a reasonable standard. *Cf. Place v. Hack,* 34 Misc.2d 777, 230 N.Y.S.2d 583, 587 (1962) ("It is easier to determine what a comprehensive plan is not, than to define what it is." (internal quotation marks omitted) (quoting Note, *Spot Zoning and the Comprehensive Plan,* 10 Syracuse L. Rev. 303, 304 (1959))). This is certainly true of the City of Bloomington Comprehensive Plan, which is almost 200 pages long. City of Bloomington, Minn., *Comprehensive Plan 2008* (adopted 2009).[8]

Additionally, a conditional use ordinance does not create a "standard" by requiring compliance with the entire comprehensive plan as a prerequisite to obtaining a permit, because a comprehensive plan does not provide sufficiently specific standards to measure compliance. Three of the four grounds relied on by the City for the denial issued here are found in its comprehensive plan; the City cited a need to (a) locate "[l]arger traffic generators ... adjacent to arterial or collector streets"; (b) "channel most high and medium density residential and mixed use growth to locations near transit, services, amenities and employment"; and (c) "preserve the character of low density neighborhoods."[9] *Id.* at 2.15, 2.19. But the City could have conceivably sought to rely on less tradi-

---

7. The ordinance at issue provided that the village council "may" grant a permit if certain standards were satisfied. *Metro 500,* 297 Minn. at 300, 211 N.W.2d at 362 (quoting Brooklyn Park Code of Ordinances § 34.12, subd. 4 (1973)).

8. *Available at* http://bloomingtonmn.gov/sites/default/files/comp_plan_portfolio_0.pdf. The comprehensive plan was amended in 2012 and 2014. *See Comprehensive Plan: Imagine*

*Bloomington 2025,* City of Bloomington, Minn., http://bloomingtonmn.gov/comprehensive-plan-imagine-bloomington-2025 (last visited March 3, 2015).

9. These may be valid reasons to deny a conditional use permit. But if the City wanted to rely on these as "standards," it should have specifically included them in its conditional use ordinance.

tional but also dubious reasons, such as whether the proposed use will (1) permit "solar access for adjacent properties"; (2) encourage "a sufficiently diverse employment base"; (3) allow for "pedestrian and cycle connections between adjacent properties"; (4) utilize "transit equipment to shuttle residents/customers to and from areas not well served by transit"; (5) "incorporate transit, pedestrian and cycle friendly design features"; (6) promote "development of complementary uses within walking distance of one another"; (7) encourage "low impact development practices ... to reduce pollutant loading to surface waters"; or (8) "[c]reate linkages between the private sector, high schools, and post-secondary institutions." *Id.* at 2.13, 2.19, 4.52, 4.54, 4.55, 4.59, 6.23. 7.18. The meaning of at least some of these guidelines is unclear· at best and it is a complete mystery how the City would measure compliance. It is also a safe bet that the next generation of comprehensive plans will place more ill-defined and nonspecific burdens on property owners. I have no difficulty envisioning a comprehensive plan that, depending on the political or ideological inclinations of the drafters, could include buzzwords such as "low carbon footprint" or, "environmental sensitivity," or vague references to the promotion of economic development or any similar formulation. *See, e.g., id.* at 2.1–2.2 (promoting "sustainable development").

What is difficult to envision is how any applicant could comply with the entire comprehensive plan. The effect of relying on comprehensive plans to deny conditional use permits, and to control individual development, is to empower arbitrary and capricious decision-making by cities and to increase the likelihood that developers that enjoy political favor will be successful and those out of favor will not. The traditional deferential standard of review compounds this problem.[10]

Furthermore, and as noted above, a comprehensive plan is a broad, forward-looking document that is not designed to support specific land-use decisions. The City of Bloomington Comprehensive Plan uses headings such as "Goals," "Vision," "Intent," and "Strategies." *See id.* at 2.1, 2.19. Like the ordinance in *Metro 500,* comprehensive plans do not mandate requirements but rather create a general framework that supports specific zoning ordinances. *See Metro 500,* 297 Minn. at 300, 211 N.W.2d at 362 (stating that a zoning ordinance must "make the issuance of a [conditional]-use permit mandatory upon the meeting of certain standards"). RDNT also notes that its proposed use would in fact further the City's "intent" to "[a]djust to an aging population." *See Bloomington Comprehensive Plan, supra,* at 2.1. RDNT could have equally relied on the City's goals of "encourag[ing] the development of housing to serve each stage of life," and constructing "500 affordable senior units." *Id.* at 3.10, 3.17. The fact that the City, looking for any port in the storm to deny the RDNT application, *now* weighs these goals as less important than other goals demonstrates the poor standard the comprehensive plan provides and the inherent arbitrariness that exists when the plan is relied upon to make these types of decisions.

10. Although exceeding the scope of my concurring opinion, I would also note that the City here has used the comprehensive plan to impose additional requirements on property owners. The Bloomington Comprehensive Plan requires conformance with several external documents, including the "Water System Master Plan," "Comprehensive Surface Water Management Plan," "Park Master Plan," and "Accessibility Evaluation Transition Plan." *See Bloomington Comprehensive Plan, supra,* at 6.21, 6.23, 7.15, 7.17.

In addition to these practical problems, use of the comprehensive plan in this fashion creates a higher burden on conditional use applicants. As a matter of law, an applicant's burden for proving compliance with an ordinance is much lower for a conditional use than a variance because "'the former is legislatively *permitted* in a zone subject to controls whereas the latter is legislatively *prohibited* but may be allowed for special reasons.'" *Westling v. City of St. Louis Park,* 284 Minn. 351, 356, 170 N.W.2d 218, 221 (1969) (quoting *Verona Inc. v. Mayor of W. Caldwell,* 49 N.J. 274, 229 A.2d 651, 655 (1967)); *see also Zylka,* 283 Minn. at 196, 167 N.W.2d at 49 ("[P]rovisions authorizing the issuance of [conditional]-use permits are intended to provide more flexibility in land-use control than provisions authorizing a variance."). For example, in *Inland Construction Co. v. City of Bloomington,* the applicant "more than sustained the burden of proof" merely by providing evidence that the proposed use would not cause traffic congestion or be a nuisance to adjacent residents. 292 Minn. 374, 387–89, 195 N.W.2d 558, 567–68 (1972). By requiring a conditional use applicant to comply with the entire comprehensive plan, a municipality can deny the application for countless reasons, which effectively eviscerates the lower burden that should be afforded to such applicants. This creates a presumptive prohibition on conditional uses and essentially puts a conditional use on the same level as a variance.

Our more recent cases have further confused matters by explicitly authorizing use of comprehensive plans when making decisions on conditional use applications, demonstrating an increased deference to municipalities that is seemingly at odds with our holding in *Zylka.* In *Barton Contracting Co. v. City of Afton,* we affirmed the city's denial of a conditional use permit for gravel mining because, *inter alia,* the use was contrary to the comprehensive plan, which was "permeated with evidence of a strong desire to preserve the rural character and unique scenic beauty of Afton and the St. Croix Valley." 268 N.W.2d 712, 717 (Minn.1978). We acknowledged a municipality's "'broad discretionary power to deny [a conditional use] application,'" *id.* (quoting *Zylka,* 283 Minn. at 196, 167 N.W.2d at 49), but we did not analyze the *Zylka* factors. Instead, we held that a municipality merely must provide "stated reasons for its decision" to deny the permit and may consider "whether the proposed use is consistent with its land-use plan." *Id.* In *C.R. Investments v. Village of Shoreview,* we again allowed a municipality to rely on its comprehensive plan to deny a conditional use permit, although we nevertheless invalidated the permit denial because the village relied on provisions in the comprehensive plan that were "unreasonably vague and subjective." 304 N.W.2d 320, 326–28 (Minn.1981); *see also Hubbard Broad. v. City of Afton,* 323 N.W.2d 757, 763 · (Minn.1982) (affirming permit denial for same reasons as in *Barton* ).[11]

Our holdings in *Barton, C.R. Investments,* and *Hubbard Broadcasting* are troubling for several reasons. Citing no authority, these cases contradict our holding in *Zylka* that a municipality must either rely on the specific standards in the ordinance or demonstrate that the use endangers the public health, safety, or welfare. *Zylka,* 283 Minn. at 196, 167 N.W.2d at 49. The ordinances in question in these cases provided no specific standard, and we did not consider whether the city made

---

11. It should be noted that these cases predate the 1995/1997 amendments to the planning statutes that purportedly heightened the legal authority of comprehensive plans. We have had no occasion to consider this precise issue since those amendments.

findings that the proposed use was hazardous to the community. *See, e.g., Barton,* 268 N.W.2d at 719–20 (Iverson, J., dissenting). As demonstrated above in Part I, these cases are at odds with a majority of jurisdictions around the country. The cases suggest a function of comprehensive plans that is contrary to their intended and historical use. Finally, the original holding in *Barton* is called into considerable question because, less than 1 month after deciding *Barton,* we stated that when considering a conditional use application, a municipal council "has the function ... of applying *specific use standards* set by the zoning ordinance to a particular individual use and *must be held strictly to those standards." State, by Rochester Ass'n of Neighborhoods v. City of Rochester,* 268 N.W.2d 885, 889 (Minn.1978) (emphasis added).

### IV.

Property rights enjoy protection under both the federal and state constitutions. The effect, if not the purpose, of modern-day municipal, regional, and state land-use regulation is to prohibit property owners from using their property as they wish and to do so without compensating the owner for the lost use. Of course, given that the constitutionality of zoning, for good or ill, is no longer in dispute, some regulation, and some lost use, is permissible. But I write separately to highlight the challenges, and dangers, presented by use of comprehensive planning as a prohibitory tool and to specifically reject the approach taken by the City here. The difficulties and contradictions associated with the current state, regional, and municipal planning statutes necessitate that the Legislature construct a rational statutory framework that begins with a recognition of the constitutional rights of property owners and then sets out the permissible limits for land-use

planning beneficial to the community as a whole. For our part, we may well have to consider whether our current deferential standard in land-use regulatory matters remains constitutionally viable; this issue is best left for another day.

In *Zylka v. City of Crystal,* 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969), we held that when denying a conditional use permit, a municipality must either (1) rely on specific standards outlined in the zoning ordinance, or (2) demonstrate that the proposed use endangers the public health, safety, or general welfare. I conclude that *Zylka* is the best expression of the standard that must be met to uphold the denial of a conditional use permit. Because I also conclude that the City has met the second of the two *Zylka* requirements, I join the majority opinion.